```
1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF CONNECTICUT
2
   - - - - - - - - - - - - - x
3                           :
   UNITED STATES OF AMERICA, :    No. 3:17-cr-00047(SRU)
4              Government,   :    915 Lafayette Boulevard
                            :    Bridgeport, Connecticut
5          vs.              :
                            :
6   THOMAS J. CONNERTON,     :    November 30, 2017
              Defendant.    :
7   - - - - - - - - - - - - - x
8
9       ARRAIGNMENT ON SECOND SUPERSEDING INDICTMENT
10
   B E F O R E:
11
       THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.
12
13  A P P E A R A N C E S:
14
       FOR THE GOVERNMENT:
15
           UNITED STATES ATTORNEY'S OFFICE
16             157 Church Street, 25th Floor
               New Haven, Connecticut  06510
17         BY:  MICHAEL S. McGARRY, AUSA
18
       FOR THE DEFENDANT:
19
           GOLDBLATT, MARQUETTE & RASHBA, P.C.
20             60 Washington Avenue, Suite 302
               Hamden, Connecticut  06518
21         BY:  RICHARD C. MARQUETTE, ESQ.
22
23             Sharon L. Masse, RMR, CRR
               Official Court Reporter
24             915 Lafayette Boulevard
             Bridgeport, Connecticut  06604
25               Tel: (860)937-4177
```

```
 1              (Proceedings commenced at 11:08 a.m.)

 2              THE COURT:  Good morning.  We're here in the

 3      matter of United States v. Thomas Connerton.  Could I have

 4      appearances, please.

 5              MR. McGARRY:  Good morning, Your Honor.  Mike

 6      McGarry from the U.S. Attorney's Office for the United

 7      States of America.  With me today at counsel table is

 8      Special Agent Steve West from the FBI and Sean Darling

 9      from the IRS, and we're also joined by Elizabeth McCartney

10      from the FBI.

11              And I'll just point out I don't see anyone in

12      the courtroom, but a notice did go out to the victims in

13      this case, that they had a right to be here today.

14              THE COURT:  Very good.  Thank you.

15              MR. MARQUETTE:  Good morning, Your Honor.

16      Attorney Richard Marquette for Mr. Connerton, who's with

17      me at my table.

18              THE COURT:  Very good.  I understand we're here

19      for arraignment on a second superseding indictment.

20              MR. McGARRY:  That's correct, Your Honor.  A

21      superseding indictment was returned and filed on

22      November 20.

23              THE COURT:  Very good.  Okay.

24              Mr. Connerton, the first thing I want to do is

25      tell you I'm in no hurry today, so as we go through things
```

1    today, if you have questions or concerns, just let me

2    know, and we'll take as much time as needed to try to sort

3    that out.

4              I want to start by advising you of certain

5    rights you have today and always.  The first is the right

6    to remain silent, which means that you don't have to say

7    anything at all in court today.  You don't have to answer

8    my questions.  You don't have to make a statement of any

9    kind.  If you start speaking, you can stop whenever you

10   want to; and you can speak with Mr. Marquette before you

11   say anything in court.  Do you understand?

12              THE DEFENDANT:  Yes, I do.

13              THE COURT:  All right.  Whatever you do say will

14   be taken down for the record by my court reporter and

15   could be used against you in this or some other case.  Do

16   you understand that?

17              THE DEFENDANT:  I'm sorry?

18              THE COURT:  Whatever you say will be taken down

19   for the record and could be used against you --

20              THE DEFENDANT:  I understand that.

21              THE COURT:  Oh, very good.  Okay.

22              You have the right to counsel, not just today

23   but at every stage of your case, all the way through

24   appeal, if need be, and you have the right to have counsel

25   appointed for you at no cost if you cannot afford counsel.

1    Do you understand that?

2              THE DEFENDANT:  Yes.

3              THE COURT:  All right.  And there's something

4    called the attorney-client privilege, which means that

5    your private communications with your lawyer will remain

6    private.  Do you understand that?

7              THE DEFENDANT:  Yes.

8              THE COURT:  Okay.  All right.

9              So have you been provided with a copy of the

10   superseding indictment?

11             THE DEFENDANT:  I have, Your Honor.

12             THE COURT:  All right.  And you've had a chance

13   to read it and discuss it with Mr. Marquette?

14             THE DEFENDANT:  I have -- I have not discussed

15   it at length with Mr. Marquette.  I have read it, and

16   aside from the -- the additional charge, I have issues

17   with content that's been modified since the last

18   indictment.

19             THE COURT:  Okay.  Well, why don't we start by

20   just asking Mr. McGarry to summarize or describe the

21   counts, that is, the nature of the charges and the maximum

22   penalties that Mr. Connerton faces with respect to each of

23   those counts.

24             MR. McGARRY:  Thank you, Your Honor.

25   Mr. Connerton is charged in a 39-count superseding

1    indictment returned by a federal grand jury seated in New

2    Haven, Connecticut.  Counts 1 through 12 charge

3    Mr. Connerton with violation of Title 18 United States

4    Code Sections 1343 wire fraud and 2 aiding and abetting.

5    The maximum penalty for each count of wire fraud would be

6    twenty years imprisonment, three years of supervised

7    release, possible fine of $250,000 or twice the gross gain

8    or loss, as well as a special assessment of $100.

9            Count 13 is a count of mail fraud in violation

10   of Title 18 United States Code Section 1341.  That also

11   carries a maximum penalty of twenty years in prison, three

12   years of supervised release, a fine of $250,000 or twice

13   the gross gain or loss, and a special assessment of $100.

14           Counts 14 through 34 are securities fraud in

15   violation of Title 15 United States Code Section 78j(b)

16   and 78ff, and that is commonly referred to as 10-b5, with

17   a maximum penalty of five years imprisonment, three years

18   of supervised release, I believe a $10,000 fine and a

19   special assessment of $100.

20           Counts 34 through 37 are Title 18 United States

21   Code Section 1957 money laundering --

22           THE COURT:  Let me just interrupt.  It looks to

23   me like the securities fraud counts are 14 through 31, and

24   money laundering is 32 through 37?

25           MR. McGARRY:  I believe I might have misspoke.

1    I think that you're correct.  If I could check, Your

2    Honor.

3              THE COURT:  Sure.

4              MR. McGARRY:  My summary sheet had a typo.  The

5    indictment is correct.

6              THE COURT:  All right.  So just to be clear, the

7    securities fraud counts are 14 through 31, and the money

8    laundering is 32 through 37.  Do you understand,

9    Mr. Connerton?

10             THE DEFENDANT:  I do.

11             THE COURT:  Okay.

12             MR. McGARRY:  And each money laundering count is

13   ten years imprisonment, three years of supervised release,

14   a $250,000 fine and a special assessment of $100.

15             Count 38 is a money laundering conspiracy in

16   violation of Title 18 United States Code Section 1956(h).

17   That count carries a maximum penalty of twenty years

18   imprisonment, three years of supervised release, a

19   $500,000 fine and a special assessment of $100.

20             And Count 39, which in essence is the new count,

21   is evasion of taxes, in violation of Title 26 United

22   States Code Section 7201.  That has a maximum penalty of

23   five years imprisonment, three years of supervised

24   release, a $100,000 fine and a special assessment of $100.

25             And there also are notice of forfeiture

1    allegations related to the fraud counts as well as to the

2    money laundering counts.

3            THE COURT:  All right, let me have one

4    clarification.  First, what is the maximum imprisonment

5    term for Count 38?  I think you said twenty years.  I

6    thought it was ten years.

7            MR. McGARRY:  I think for 1956(h), Your Honor,

8    I do have the -- I had the book -- I think it's twenty

9    years.

10            THE COURT:  Okay.

11            MR. McGARRY:  We could check if I had my statute

12    book.

13            THE COURT:  Yes, I've got it.  Hold on.

14            Well, I've got one that's a couple years old.

15    Hopefully it hasn't changed.

16            Okay, 1956(h) says:  Any person who conspires to

17    commit any offense defined in this section shall be

18    subject to the same penalties as those prescribed for the

19    offense, the commission of which was the object of the

20    conspiracy.

21            Because the money laundering was the object of

22    the conspiracy, I think it would be ten years.

23            MR. McGARRY:  Well, I would agree, Your Honor,

24    if the money laundering conspiracy were limited to 1957;

25    but I believe the money laundering conspiracy, as charged

1     in the indictment, would support a violation of

2     1956(a)(1), which I think has a maximum penalty of twenty

3     years. 1956(a)(1)(B)(i) and 1957, so page 17 of the

4     indictment has a dual object money laundering conspiracy

5     where, as alleged, Mr. Connerton and Ms. Erickson

6     conspired not just to transact in specified unlawful

7     activity greater than $10,000, which is object B, but also

8     to conduct financial transactions to conceal, disguise the

9     nature, source, ownership and control of the proceeds in

10     violation of 1956(a)(1)(B)(i), which would then be a

11     maximum penalty of twenty years.

12             THE COURT: Okay, and where do you find the

13     twenty years?

14             MR. McGARRY: I believe it's in 1956 at the end

15     of --

16             THE COURT: (h)? Which says: Any person who

17     conspires to commit any offense defined in this section --

18     which presumably includes (a) -- or section 1957 shall be

19     subject to the same penalties prescribed.

20             MR. McGARRY: So under 1956 I think (a)(1) or

21     (B).

22             THE COURT: Do you have the statute book? I'll

23     let you look at this if you want.

24             MR. McGARRY: Sure, but I believe it's under (A)

25     or (B) after (ii).

1          THE COURT:  Yes, at that point it says: ...

2     shall be sentenced to a fine of not more than $500,000, or

3     twice the value of the property.

4          MR. McGARRY:  Reading down further, Your Honor,

5     under (2)(A)(B)(i), "shall be sentenced to a fine," and

6     then goes on, "or greater, imprisonment for not more than

7     twenty years, or both.  For the purpose of the offense

8     described in subparagraph (B), the defendant's knowledge

9     may be established by proof..."

10          THE COURT:  Got it.  Okay, that's helpful.

11     Thank you.

12          All right, very good.  So you had it right.

13          MR. McGARRY:  Yes.

14          THE COURT:  It's worth checking.

15          MR. McGARRY:  No, I appreciate that, Your Honor,

16     and it is interesting because I think, not to put the cart

17     way before the horse, if we were to have a jury verdict

18     form, one would probably want to have a special question,

19     not a special verdict form, but if you find that he's

20     guilty of 1956 (h), do you find the first object, you all

21     must be unanimous; the second object, you all must be

22     unanimous; or both; which if they only were to find object

23     B, then the Court would only have up to ten years on that

24     conspiracy conviction because that would find that it was

25     the 1957 that they agreed to violate.

1     THE COURT:  All right.  Mr. Connerton, we've

2  been discussing at some length now the potential penalties

3  that you face for each of these various counts that are

4  set forth in the superseding indictment.  Do you

5  understand the potential penalties for each of those

6  counts?

7     THE DEFENDANT:  I do, Your Honor.

8     THE COURT:  Any questions about the nature of

9  the charges or the potential penalties that you would

10  face --

11     THE DEFENDANT:  I don't have any questions

12  regarding the penalties at all.

13     THE COURT:  Okay.

14     THE DEFENDANT:  You know, certainly have

15  questions regarding the charges, but --

16     THE COURT:  Okay.  The only other thing I wanted

17  to say about penalties before we move to that is the

18  penalties for each of these various 39 counts in theory

19  can be run consecutively, meaning one after the other, so

20  that to come up with a total penalty, you would have to

21  add up all of the -- the total potential penalty, you'd

22  have to add up all the potential years, you'd have to add

23  up all the potential fines, and add up all the potential

24  supervised release terms, except that they would run

25  concurrently, and then add up all the special assessments.

1    Do you understand?

2              THE DEFENDANT:  I do.

3              THE COURT:  Okay.  So did you want to raise an

4    issue regarding the charges?

5              MR. MARQUETTE:  May we sit down?

6              THE COURT:  Of course.  Yes.  I want to remind

7    you that you may want to speak through your lawyer if you

8    have some issues because --

9              THE DEFENDANT:  I don't think Richard --

10   Mr. Marquette has any issue with myself --

11             THE COURT:  All right.

12             THE DEFENDANT:  -- talking to you directly, Your

13   Honor.

14             THE COURT:  That's fine.  I just want to be sure

15   that you understand whatever you say is going to be on the

16   record.

17             THE DEFENDANT:  I have no problems with that.

18             THE COURT:  All right.

19             THE DEFENDANT:  I just saw this, the memorandum

20   to aid in the status conference.  I guess that's a matter

21   for today?

22             THE COURT:  Yes, we'll probably take those

23   issues up in a moment.

24             THE DEFENDANT:  Okay.  Regarding the superseding

25   indictment, there's been some issue with the comprehension

1     of the patent process.  I'm an engineer, a scientist and

2     an inventor.  I am not a securities expert.  I'm not -- I

3     used securities to fund my science.  That's why we're

4     here, the questions regarding that.

5          But regarding the perception of the patent matters

6     relative to my case, in the previous indictment there was

7     inferences in the indictment that indicated that I, in

8     some way, deceptively, relative to my investors, had put

9     forth the representation in a way, I guess is the best way

10    to put it, that I had an ongoing patent, when in fact they

11    were claiming that I had a number of patents.  And if --

12    if we're familiar with the patent process, it's certainly

13    a prosecutorial process, an ongoing process that normally

14    stems from a date, and many times the value of patents is

15    not only considered the matter within the patent, it is

16    considered that date, and certainly now so that the United

17    States Patent Office has gone to a first to file basis.

18    So dates become important regarding the preservation of

19    the matter as of that date.

20         So it was very obvious to me on the first indictment

21    that there was a real lack of understanding on the part of

22    the prosecution, I guess, regarding patent matters and

23    that I had misrepresented myself to my investors, which

24    was never the case.  I've always represented that we have

25    a patent pending, which we always have, in a continuum.

1          So I see that in their reaction to what we discovered

2    in the first indictment, they have amended certain

3    paragraphs in the -- in the matter at hand here.  And I --

4    I sensed that it was starting in the last indictment

5    whereby -- and I don't really understand the ability of

6    the FBI to penetrate the United States Trademark and

7    Patent Office.  I assume, based on what I've heard

8    conversationally in our proffer and what I saw in the

9    initial indictment, it talked about how the last

10   submission was not even reviewed by an examiner yet, as

11   though there was some derogatory thing with that, which

12   there isn't, it's part of the process.  And I actually

13   looked at that and made a note on my indictment.  I said,

14   "How would they know that?"  To me that was the beginning

15   of opening the door of my attorney-client privilege

16   relative to my counsel on the patent matters.  I would --

17   I would only have been informed that, whether it was

18   examined or not, by my -- my patent attorney.  And to me

19   their reflection of that in the indictment was kind of in

20   the end run around my attorney-client privilege relative

21   to my patent matters.

22          And the modifications that they have in paragraph 7

23   of this new indictment is clearly a violation of my

24   attorney-client privilege.  It also clearly indicates to

25   me once again that they lack a thorough knowledge of the

1    process and the contents therein.

2         And, in addition to that, it appears to me that it's

3    a clear attempt to defame me based on what I've been

4    involved with regarding the prosecution of my patent

5    relative to this matter and relative to this whole issue

6    of why I've raised the funds and whatnot.

7         I mean, what they're saying here is that 2008, that

8    advanced approximately 85 claims.  That is privileged

9    information relative to my number of claims, rejection,

10   withdrawal.  Those are clearly matters that should only be

11   pertinent and communicated between myself and my counsel

12   relative to my patent issues.

13        And all I can say is that the way they also stated,

14   in addition to what I consider a violation of my

15   attorney-client, they stated that of all 85 claims

16   advanced by Connerton in that application, all of the 85

17   claims were either rejected or as unpatentable.  They're

18   rendering an opinion regarding my patent.

19             THE COURT:  Well, okay.

20             THE DEFENDANT:  They don't have the right to

21   render what's patentable and what isn't.  And, in fact,

22   Your Honor, if my patent was granted, many times claims

23   that have been rejected are still an element of that

24   patent.

25             THE COURT:  Okay, sure.  But understand that the

1   allegations of the superseding indictment are just that;

2   they're allegations.  These are positions that are being

3   claimed by the government.  And, you know, there are

4   sources, frankly, of this information other than your

5   lawyer.

6           THE DEFENDANT:  No one can go to the patent

7   office and get this information.

8           THE COURT:  Well, a grand jury --

9           THE DEFENDANT:  The content of my prosecution.

10           THE COURT:  A grand jury subpoena could call for

11   that information.  So I don't know how the government

12   obtained it, but you should not assume that there's been

13   any violation of attorney-client privilege there because

14   there are legitimate ways for them to obtain the

15   information.

16           THE DEFENDANT:  But -- but -- and then they say

17   unpatentable or withdrawn.  But what they're saying is, of

18   all those 85 claims, what they're in fact saying here,

19   Your Honor, is that there's nothing left.

20           THE COURT:  That is what they're saying, right.

21           THE DEFENDANT:  And that's not true.

22           THE COURT:  Well, it may not be true.  It's an

23   allegation.  And so the way the process works --

24           THE DEFENDANT:  That's a false statement.

25           THE COURT:  Well, it may be shown to be false.

1    That's what the trial will be about, is your side will

2    seek to show that the allegations in fact are not accurate

3    or true.  That's what the trial is about.

4            THE DEFENDANT:  But the impression here to my

5    investors is that I've been deficient and that I have

6    nothing that I'm moving -- that I'm advancing in my patent

7    process.  And, clearly, if this was true, even based on a

8    numeric basis, I have nothing.  And that -- that is so not

9    true.

10           THE COURT:  Okay.

11           THE DEFENDANT:  And that really is, in effect --

12   in fact, last Friday for the first time I got to read the

13   grand jury testimony and --

14           THE COURT:  Okay.

15           MR. MARQUETTE:  Your Honor, I'll note for the

16   record that that transcript was benevolently provided to

17   me by counsel way ahead of trial schedule.  As you know,

18   it's only ten days required.  He gave it to me last week,

19   and Mr. Connerton saw it then.

20           THE COURT:  Okay, very good.

21           Well, Mr. Connerton, today is not the time for

22   you to be kind of challenging the veracity of the

23   allegations.  We're really here just to make sure that you

24   understand the allegations, and it's obvious to me that

25   you do, and then to take your plea with respect to these

1  various charges.  And presumably if you think the charges

2  are false, you're going to plead not guilty, which is what

3  I expect you're going to be doing in just a moment.

4       THE DEFENDANT:  Yes, yes.

5       THE COURT:  So let's -- why don't we get on to

6  that and just get that formality out of the way because I

7  need to ask how you plead now to each of the charges in

8  the superseding indictment.

9       THE DEFENDANT:  Are we going to go through all

10 the charges?

11      THE COURT:  We can -- I'll listen to counsel if

12 you want to do it as a group or if you want to do it one

13 by one.  It doesn't matter to me.  Do you have a

14 preference?

15      THE DEFENDANT:  Well, I've only done this one

16 other time; and to be quite frank with you, the other time

17 that I pled, in front of Mr. -- Judge Garfinkel, I believe

18 I had a concussion.

19      THE COURT:  Okay.  All right.  How are you

20 feeling today?

21      THE DEFENDANT:  I'm feeling fine today.

22      THE COURT:  Good, okay.  All right.  So why

23 don't we do this --

24      THE DEFENDANT:  I would just like to make one

25 point --

1          THE COURT:  Okay.

2          THE DEFENDANT:  -- in my plead, and should I do

3     it before the plead specific to that section or should I

4     do it now?

5          THE COURT:  Why don't we take your pleas, and

6     then any comments you want to make I'm happy to hear you.

7          THE DEFENDANT:  Okay.

8          THE COURT:  So is there a preference for going

9     count by count versus --

10         MR. MARQUETTE:  I don't think so, Your Honor.  I

11    just want to add for the record, Your Honor, I visited

12    Mr. Connerton's home last Friday, had a five-and-a-half

13    hour visit with the superseding indictment.  We amply

14    discussed it in my opinion that day, so I believe he's

15    familiar with all the charges and salient facts of which

16    he's charged, so I think it's okay if we waive the reading

17    of it.

18         THE COURT:  Very good.  So -- go ahead, Mr.

19    McGarry.

20         MR. McGARRY:  I just want to put on the record

21    before the plea, because of Your Honor's question I went

22    back and double-checked the securities fraud under 10b-5,

23    under 17 CFR 240.10b-5(b), the maximum penalty on the

24    securities fraud counts would be twenty years per count.

25         THE COURT:  Yes, I think that's what you said

1    before.

2          MR. McGARRY:  I wasn't one hundred percent sure

3    if I --

4          THE COURT:  Yes.

5          MR. McGARRY:  Okay, thank you.

6          THE COURT:  That's what I had.  Very good.

7          All right.  So, Mr. Connerton, just to be clear,

8    what Mr. Marquette just said is he's suggesting that

9    you're willing to waive the reading, in other words, the

10   way --

11         THE DEFENDANT:  I understand.

12         THE COURT:  Do you want us to read the

13   indictment, superseding indictment?

14         THE DEFENDANT:  No.  No, I'm okay.

15         THE COURT:  All right, very good.  And are you

16   prepared to enter a plea to groups of charges or do you

17   want to go one by one through the 39 charges?

18         THE DEFENDANT:  No, I'm -- I'm prepared to do a

19   "not guilty" to all charges.

20         THE COURT:  Very good.  All right.

21         So if you would stand, I'm going to ask the

22   courtroom deputy, please, to formally put you to plea.

23         COURTROOM DEPUTY:  In the case of United States

24   v. Thomas J. Connerton, Criminal Number 3:17-CR-47-SRU, as

25   to Counts 1 through 12 of the superseding indictment,

1  charging you with the violation of Title 18 United States

2  Code Section 1343 and 2, what is your plea?

3           THE DEFENDANT:  Not guilty.

4           COURTROOM DEPUTY:  As to Count 13 of the

5  superseding indictment, charging you with the violation of

6  Title 18 United States Code Section 1341 and 2, what is

7  your plea?

8           THE DEFENDANT:  Not guilty.

9           COURTROOM DEPUTY:  As to Counts 14 through 31 of

10  the superseding indictment, charging you with the

11  violation of Title 15 United States Code Section 78j(b)and

12  78ff, Title 17 Code of the Federal Regulations Sections

13  240.10b-5 and Title 18 United States Code Section 2, what

14  is your plea?

15           THE DEFENDANT:  Not guilty.

16           COURTROOM DEPUTY:  As to Counts 32 through 37 of

17  the superseding indictment, charging you with the

18  violation of Title 18 United States Code Section 1957 and

19  2, what is your plea?

20           THE DEFENDANT:  Not guilty.

21           COURTROOM DEPUTY:  As to Count 38 of the

22  superseding indictment charging you with the violation of

23  Title 18 United States Code Section 1956(h), what is your

24  plea?

25           THE DEFENDANT:  Not guilty.

```
 1            COURTROOM DEPUTY:  As to Count 39 of the
 2   superseding indictment, charging you with the violation of
 3   Title 26 United States Code 7201, what is your plea?
 4            THE DEFENDANT:  Not guilty.
 5            COURTROOM DEPUTY:  Your Honor, the defendant
 6   pleads not guilty to Counts 1 through 39 of the
 7   superseding indictment.
 8            THE COURT:  Thank you.
 9            Okay.  Mr. Connerton, you had a point you wanted
10   to make?
11            THE DEFENDANT:  Yes.  Regarding the -- regarding
12   the tax charge here, I find it -- I find it interesting
13   that in the last 24 months that I've had three
14   opportunities to sell my intellectual property, and the
15   first one was restrained by the Securities and Exchange
16   Commission, and I was actually in the process of selling
17   my intellectual property.  I had put a presentation on to
18   a 7 billion dollar company in Chicago.  I have emails from
19   that company saying that they were willing to begin to
20   formulate a deal with me.  We had an issue with a
21   non-disclose agreement, agreement they wouldn't modify
22   their non-disclose agreement to protect the trade secrets
23   in my patent application, upon which I chose to move on to
24   the next company.  I was dealing with three of the four
25   major surgical glove companies in the world.
```

1           And so I suffered restraint from the Securities

2    and Exchange Commission because when they come in with the

3    restraining order and their service on me, they subpoenaed

4    all the major glove companies in the world, and I could

5    not have any discussions with those companies as long as

6    the TRO was in effect until the sign-off occurred in

7    Washington, D.C. by the commissioners of the SEC, which

8    happened on the 3rd of April of this year.  And I was

9    incarcerated by these gentlemen for three weeks at that

10   time, so I couldn't react.  I was actually opening --

11   there was a window between the SEC sign-off and when this

12   activity started to begin.

13       I've since been restrained twice from selling

14   intellectual property by this action; one being, once

15   again, talking to the glove companies regarding this piece

16   of intellectual property and actually the sale of another

17   piece of intellectual property outside of this -- this

18   action, a home-related product.  And that is -- that is

19   taking place right now without my participation.

20           And so there's been three instances since this whole

21   SEC matter and then this matter now where I have had

22   opportunities that within a matter of, you know, anywhere

23   from three to six months I could have achieved a sale and

24   paid my taxes, and it was always my intention to pay my

25   taxes, and I think that when this all washes out, that

1    they'll find out that my tax bill is much less than the

2    claim is for.  And what I -- what I had done was I, you

3    know, kept putting money back into the project and the

4    company.

5         The project and the company, mostly the project, is

6    the development of a surgical glove material which can be

7    used in other medical gloves that exhibits very high

8    resistance to cut, puncture and tear; and, in fact, in

9    some of those physical properties, it actually eliminates

10   things such as tear in some of our testing.

11        So I find it ironic that, you know, I've had these

12   opportunities, and the only people that have been

13   restraining me has been the federal government.  It

14   boggles my mind.  This whole thing boggles my mind.  So,

15   you know, I have a real hard time understanding this

16   process.

17        I also have a hard time understanding the process,

18   after reading the testimony to the grand jury, as to how

19   people can go before a grand jury and make false

20   statements.  It's loaded with false statements.  I mean,

21   when I stand in a conference room of a $7 billion company,

22   and I receive correspondences with them in writing, and I

23   correspond with them verbally, and I'm looking forward to

24   going to the next companies, $103 billion in total sales

25   companies, the largest surgical glove company in the

1    world, two and a half to three billion company in total

2    sales, they actually came over three years ago and put a

3    presentation on to 50 of my investors in Greenwich,

4    Connecticut.

5        And that's another thing I want to talk about, is

6    some of the representations that have been made to my

7    investors by the FBI.  It's -- it's -- so the fact that we

8    have an indictment that, according to my estimation, the

9    previous indictment of the -- of the 60 paragraphs

10   contained in the indictment, 48 of them are false, false

11   statements.

12            THE COURT:  All right.  Well --

13            THE DEFENDANT:  I mean, lies, whatever you want

14   to call it.  I mean, I'm having a hard time believing that

15   my government is even capable of what I've been subjected

16   to.

17            THE COURT:  Well, okay.  But that's not really

18   anything that I can address today.  In other words --

19            THE DEFENDANT:  There are some other things.  I

20   mean, one of the things that -- I made some notes -- that

21   I would like to run by you, Your Honor, and see if we can

22   address them, is many of my investors have been the

23   subjects of false statements on the part of Mr. West.  He

24   has gone to my investors and told them that we couldn't

25   find a thing in Mr. Connerton's office, in his computer,

1    in his apartment --

2              MR. McGARRY:  Your Honor, I'm going to object.

3              THE DEFENDANT:  -- that would in any way

4    indicate that he was involved in the development of a

5    surgical glove material.

6              MR. McGARRY:  Your Honor, I'm going to object --

7              THE COURT:  Okay.

8              MR. McGARRY:  -- because it's not true, but --

9              THE COURT:  Wait.  Mr. Connerton, there really

10   isn't anything I can do about this at this time.  So the

11   way this works is the government, if it believes that

12   somebody has committed a crime, goes to a grand jury and

13   seeks an indictment.  If that person is indicted, then the

14   judicial process begins, and that's where we are.  And the

15   time for you to demonstrate the falsity of the allegations

16   or the kind of lack of credibility of a witness is going

17   to be at the trial where the jury is going to --

18             THE DEFENDANT:  I mean, the representations,

19   my -- my investors, they want to call them victims, I mean

20   these people are my investors, and it's always been my

21   intention to deliver.

22             THE COURT:  Well --

23             THE DEFENDANT:  But the restraint has happened.

24   But, I mean, even to say that the thing in Greenwich, when

25   the biggest surgical glove company comes over and puts a

1   three-and-a-half hour presentation on to my investors, and

2   my -- my consultants and my attorneys have dinner the

3   night before, to say that that was a setup to my

4   investors, you've got to be kidding me.

5           THE COURT:  Okay, but you'll have a chance to

6   show that, that that's not correct.  And there's nothing I

7   can do about it.  I can't make, at this point, I can't

8   make any factual determinations one way or the other.

9   That's not my role.

10          THE DEFENDANT:  I mean, my investors, Your

11  Honor, are confused --

12          THE COURT:  Okay.

13          THE DEFENDANT:  -- disgusted and numb.

14          THE COURT:  All right.

15          THE DEFENDANT:  And -- and that's -- being an

16  engineer scientist, you know, the one good thing about

17  science is the data never lies.

18          THE COURT:  Okay.

19          THE DEFENDANT:  So that's the world I live

20  within.

21          The other thing that I'm disturbed about, once

22  again, that I do not understand, is that there has been a

23  plea made in this matter regarding Ms. Jean Erickson, who

24  has been named, I guess, my co-conspirator at this point.

25  And what she has pled to is that after she and I, during

1    the SEC matter, before it was moved to Connecticut, was in

2    Boston, we went up and interviewed two law firms based on

3    recommendations from a member of my advisory board that

4    resides in Boston, and of two firms up there, we chose one

5    of them.  They wanted a $15,000 retainer.  My bank,

6    People's Bank, that I've had a relationship with since

7    1981, was subpoenaed by either the SEC or the FBI.  I'm

8    not sure who it was.  They sent me letters to remove my

9    funds from both my personal and my business account.  I

10   did so, put it into cashier's checks.  I could have taken

11   those checks as part of my guaranteed draw because I've

12   never exceeded that on an annual basis average-wise and --

13   or I knew that we had a forthcoming obligation regarding

14   retaining counsel for the defense of the company and

15   myself.

16              THE COURT:  Right.

17              THE DEFENDANT:  And she is an investor of the

18   company, and she had the right to pay that bill.  The

19   agreement was that I would refund her out of the money

20   that I was told to take out of the bank by the bank, and I

21   refunded her.

22              THE COURT:  Okay.  You know --

23              THE DEFENDANT:  So the refund becomes a

24   conspiracy.

25              THE COURT:  Well, okay.  What you're really

1   complaining about is the validity of the charges.  That's

2   just not something that we can really take up today.  I

3   mean, it doesn't matter if I agree with you or disagree

4   with you, frankly, because I'm not going to decide those

5   issues.  The jury will have to decide those issues.  And

6   so what we need to do is get this case poised to get to a

7   jury trial.

8              THE DEFENDANT:  Well, it might be -- it might

9   not be a jury trial.

10             THE COURT:  Well, I think it probably will be.

11  I think we have --

12             THE DEFENDANT:  Whose choice is that?

13             THE COURT:  The parties.

14             THE DEFENDANT:  Both?

15             THE COURT:  You know --

16             MR. McGARRY:  I believe it's both, Your Honor.

17             THE COURT:  I believe it's both, too, but I've

18  never had anybody request, frankly, never had anybody

19  request a bench trial before me rather than a jury, never

20  happened, so I'm not sure what the rule is, frankly.

21             THE DEFENDANT:  I just, I look at the matter

22  here, and I look at -- I look at some of the types of

23  character assassinations that I'm already aware of

24  relative to some of the people involved here, and I think

25  that perhaps a jury trial might not be the way to go.

1    I -- I --

2              THE COURT:  All right.  Well, that's something

3    that you ought to talk through with your lawyer.  For now,

4    we'll assume it's a jury trial because typically they are;

5    but if you want to revisit that, obviously Mr. Marquette

6    will have some advice to give you about that.

7              THE DEFENDANT:  Okay.  The other matter that I

8    wanted to address was some type of restraint on the

9    circulation of the technical data and content.  There's --

10   in discovery I found my formulas that they've taken off my

11   computer.  There's some physical samples I believe that

12   they removed from my office.  There's gloves that we

13   manufactured that I think they may have removed.  It's

14   been some time since I looked at the inventory of what

15   they took during their search, but that is very, very

16   confidential stuff, and it needs to be put in a context

17   that it is restrained from circulation to any parties

18   outside of this matter.

19             And, quite frankly, what I would have thought

20   the government would do, and perhaps had they done it --

21   well, two things.  We maybe not would have gotten to this

22   point.  The first thing is that there was a very -- there

23   was a video that Mr. McGarry told me he was going to play

24   for the grand jury that illustrates the technology.  Based

25   on the testimony that I looked at, it doesn't seem to be

1    that he did what he said he was going to do.  I believe

2    that had he done that, I probably wouldn't be sitting here

3    today.  That's number one.

4              I believe also that there would be some value in

5    moving forward regarding the dismissal pursuit on our

6    part, is that Mr. McGarry should perhaps make you -- make

7    that video available to you to look at as far as, you

8    know, understanding the content of this -- of this matter.

9              But the other thing is that I would -- I would

10   have thought the government would have gotten a materials

11   expert involved here and saw what I claim and what I think

12   I have, or I know I have, relative to trying to overcome

13   all these things like in the grand jury testimony that I

14   have nothing to sell.

15             THE COURT:  Okay.  Well, you raise a number of

16   points.  Let me just confirm with Mr. McGarry that the

17   confidential formulas and technology will not be shared by

18   the government except as pursuant to its needs in this

19   case.

20             MR. McGARRY:  Sure, and I think I'll answer the

21   question this way, Your Honor.  Under Rule 6(e), anything

22   that we get by subpoena we keep confidential, and things

23   that are taken by a search, which is not necessarily under

24   Rule 6(e), is taken, it's locked up, it's kept at the FBI

25   in this case because that's the lead agency, and it's been

1    locked up I think behind a double or triple lock if you

2    count the building and the gate in the evidence room.

3          As part of discovery, we, of course, wanted to

4    give it to Mr. Marquette.  We also made a copy of the hard

5    drive, provided that to Mr. Marquette.  I think pursuant

6    to agreement with Mr. Marquette, we did take the discovery

7    from the search.  We sent it down to the Justice

8    Department copy center down at the National Advocacy

9    Center.  They scanned it or electronic copied it, sent it

10   back to us, and we provided those copies to Mr. Marquette.

11         We don't distribute publicly things.  Obviously,

12   an indictment is a public filing.  As far as a trial, we

13   usually introduce things to trial.  If there is

14   something -- and I'm thinking about tax cases where

15   sometimes we will file a copy of the tax return and then

16   maybe redact things, or when there are minor names

17   mentioned sometimes the trial documents, there's an

18   unredacted copy and a redacted copy when it goes public.

19   If there are formulas or something like that, perhaps the

20   publicly filed trial exhibits -- again, I'm not a

21   scientist -- but those could possibly be redacted if

22   that's something that the Court agreed to.

23         But as far as the general concern that the

24   information that we have that we've provided to counsel,

25   who sat for many hours with Mr. Connerton going over it,

```
 1    that we're somehow making that available generally in the
 2    public, that's just not accurate.  That's not how the
 3    Justice Department, the FBI, the IRS work.
 4              THE COURT:  Okay.
 5              THE DEFENDANT:  Your Honor, I have investors
 6    that believe that the government wants to steal what we
 7    have.
 8              THE COURT:  Well, okay.
 9              THE DEFENDANT:  I mean, that's where -- that's
10    what I'm getting calls on.
11              THE COURT:  Well, okay.  Whatever people may
12    believe, we just got an assurance that that's not
13    happening.  Obviously, the government is not going to be
14    filing a patent or seeking to produce your invention.
15              THE DEFENDANT:  I mean, at this point, this
16    technology has been held up going on in excess of a year
17    and a half --
18              THE COURT:  Yes, I mean --
19              THE DEFENDANT:  -- from the market.  I mean,
20    we're talking a life-saving technology here.
21              THE COURT:  Right.  Well, I mean, that's --
22    unfortunately, that sometimes happens with litigation, is
23    people's lives and plans get disrupted.  What I think we
24    ought to do is try to push this case forward to a trial at
25    an early date, and that's one thing I want to talk about
```

1 │ today.

2 │          So while we're on that topic, I was looking at a

3 │ mid-May trial date, May 14.  Does that work for everybody?

4 │          MR. MARQUETTE:  Yes, Your Honor.  For us it

5 │ does.

6 │          MR. McGARRY:  Yes.

7 │          THE COURT:  And I'm assuming the trial will last

8 │ maybe a week and a half or so?  Is that about right?

9 │          MR. McGARRY:  Well, two things, Your Honor.

10 │ One, depending on if Mr. Connerton were to testify in his

11 │ own defense, that might lengthen the defense case a little

12 │ bit.  We have obviously a number of charges and a number

13 │ of different, we do call them victim investors.  We were

14 │ thinking approximately two weeks for the government case,

15 │ if we were to bring someone up from the patent office, if

16 │ they were subpoenaed by a trial subpoena to come and

17 │ provide testimony, if we were going to have people from

18 │ the glove manufacturers, in addition to our financial

19 │ analyst who would testify regarding how the funds were

20 │ dissipated or used.

21 │          My only concern with the 14th is with the

22 │ Memorial Day holiday, I'm not sure of your trial day or

23 │ your -- if you sit every Friday or not, so my thought

24 │ would be if we could move it a little bit, a week or so

25 │ earlier, depending on Mr. Marquette's schedule, just so

```
 1   that we didn't have a long Memorial Day weekend where some
 2   jurors might be adding time to their weekend or we would
 3   just have to make sure to voir dire around the Memorial
 4   Day weekend.
 5          And I guess the other thing that I'll point out
 6   at this point is, assuming Mr. Marquette stays in the
 7   case, which I have every reason to think that he would,
 8   but there might be -- there is some talk, including talks
 9   with other attorneys in New Haven regarding them coming
10   into the case, I know Mr. Marquette would like it to be on
11   or after May 10.
12          MR. MARQUETTE:  Correct.  Yes, that's true, Your
13   Honor.  Thank you.
14          THE COURT:  Well, okay.  I could start as early
15   as May 9.  I am going to likely miss the 18th and the
16   30th, as well as the 28th, which is the holiday.  So --
17          MR. McGARRY:  That would be our preference.
18   Thank you, Your Honor.
19          MR. MARQUETTE:  That's fine, Your Honor.
20          THE COURT:  Can you start on the 9th?
21          MR. MARQUETTE:  Yes.
22          THE COURT:  So we'll start on May 9.  In the
23   event that a jury is selected, we'll select the jury on
24   May 4; but, either way, we'll start the evidence on May 9.
25   As I said, we are very unlikely to have trial on the 18th,
```

1  28th and 30th of May.

2          Okay, good.  Well, it's nice to have a little

3  bit of a deadline because I think that will help focus us.

4          Mr. Connerton, you have what we called speedy

5  trial rights under both the Constitution and a statute

6  known as the Speedy Trial Act, and you can waive those

7  rights or not, and I can enter an order in the interest of

8  justice to, in effect, override the rights of both you and

9  the public to an earlier trial.  Have you discussed with

10  Mr. Marquette whether or not to waive your speedy trial

11  rights?

12          THE DEFENDANT:  I have not discussed it with Mr.

13  Marquette, but I also wish, based on my own understanding,

14  to not waive those rights.

15          THE COURT:  Okay.  Well, all right.  In terms of

16  the speedy trial rights, I believe that an interest of

17  justice finding is appropriate in this case because what

18  we have is a very complex indictment, 39 counts.  We have,

19  it sounds like, an extensive amount of discovery that has

20  been forwarded to counsel in terms of hard drives and a

21  large number of witnesses.  Presumably there are witness

22  statements from a large number of witnesses.  Whether Mr.

23  Marquette stays in the case, or certainly if you get a new

24  lawyer, either lawyer is going to need a significant

25  amount of time in order to prepare, review those materials

1    and prepare for the trial of this matter.  And there's

2    going to be, obviously, bank records, computer data,

3    patent applications and related documents, victim

4    statements.

5           The scope of the discovery here I think is quite

6    extensive, and it's going to take a significant amount of

7    review.  It may well also require, as has been suggested,

8    perhaps some expert testimony.  So it may require time for

9    experts to review those materials as well.

10          So it appears to me that the interests of the

11   public and, Mr. Connerton, of yourself in a speedier trial

12   than May need to give way to what we call the interests of

13   justice here.  Frankly, we want to make sure you get a

14   fair trial, and you're not going to get a fair trial if

15   you don't have a lawyer who is prepared to present the

16   best defense possible for you.

17          MR. MARQUETTE:  I just received two additional

18   diskettes today, Diskettes 7 and 8 --

19          THE COURT:  Right.

20          MR. MARQUETTE:  -- with many pages on them.

21          THE COURT:  So I'm making what we call the ends

22   of justice or interests of justice finding under 18 U.S.C.

23   Section 3161(h)(7)(A) and find that the speedy trial

24   rights, through May 9, are to be overridden in this case.

25          THE DEFENDANT:  Can I just --

```
 1              THE COURT:  Yes.

 2              THE DEFENDANT:  I have one more thing that I'm

 3     concerned about that I want to touch on.  As a result of

 4     the indictment and the inferences that it carries,

 5     especially when you introduce the word "fraud," my patent

 6     counsel has petitioned the United States Patent Office to

 7     withdraw as my counsel.  This is a counsel that I have had

 8     an 11-year relationship with, a very good relationship

 9     with, I think.  We've never had any issues.  They've

10     always been paid in a competently, timely manner.  They

11     have done a job for me that I consider to be good and

12     respectful.  And they have withdrawn as a result of the

13     indictment.

14              And I'm -- I'm faced now with -- what I had

15     intended on doing was preparing a filing.  I was going to

16     do it previous to the SEC matter.  I couldn't do it during

17     the SEC TRO.  I was hoping to do it after it.  And so now

18     I have some -- my final discovery regarding my patent that

19     I need to file.  I was hoping to file that discovery as a

20     CIP previous to the -- previous to the response that I'm

21     anticipating getting.  And I talked to the patent

22     attorneys, and they are going to notify me of that

23     vis-à-vis some people on the outside to whom they're going

24     to direct that communication.  But it would benefit both

25     myself and my investors to respond to that now.  Given my
```

1  incarceration, that becomes impossible to do from in --

2  being incarcerated.  I need my computer.  I need my data.

3  That's another issue.  I lent my computer to Ms. Erickson.

4  I'm having trouble, some people on the outside are trying

5  to communicate with her to get my computer back.  We -- we

6  don't know how that's going to happen.  We need to get

7  that back.  It's got everything on it.  And so that's

8  something that perhaps we can have some help with some way

9  getting my computer back.

10          But I need to have the flexibility and the

11  resources available to me to formulate that response, and

12  being incarcerated does not allow me that.  I'm hoping

13  that after we have an evidentiary hearing that we can

14  present you with enough of the truth here that justice

15  will take its course, but I can't say that that shouldn't

16  be happening now.  So I consider also in preparation for

17  an evidentiary hearing, I need to be out.  I need to get

18  my samples.  I need to get the gloves, samples of the

19  gloves we manufactured.  I don't know what they took.

20  Once again, I don't have the inventory, what was taken.

21  That's one of the other things.  I was under the

22  impression they had taken samples, physical samples.  They

23  certainly took data.  They certainly have all the data

24  they wanted on my computer, and any claims that nothing

25  exists here is just bizarre to me.

1        So I don't know how to cross that bridge.  I know

2   that I have not attempted to get bonded out.  I was hoping

3   that an evidentiary hearing was something that I could

4   prepare for and be successful at.

5              THE COURT:  Okay.

6              THE DEFENDANT:  I don't have any feel for this

7   process, I guess.

8              THE COURT:  Okay.  Well, I think probably the

9   way to go is for you and Mr. Marquette to confer about

10  your options because, you know, a judge is a very passive

11  player and waits for things to be presented and then

12  decides them.  And so whether that's an evidentiary

13  hearing of some sort or a motion for a bond or whatever,

14  the initiation has to come from a party, and then I can

15  respond.  I can't really --

16             THE DEFENDANT:  Well, is there -- is there any

17  way, Your Honor, where we could define at this point the

18  parameters for a bond?  I know that some people get one

19  signature; some people get two signatures.  There seems to

20  be some overtures on Mr. McGarry's part regarding, you

21  know, physical equity.  I mean, I -- you know, basically

22  the SEC starved me out.

23             THE COURT:  Okay.  But really you're asking me

24  kind of to give you legal advice, and that's what I can't

25  do.

 1          MR. MARQUETTE:  I just want to put on the

 2     record, Your Honor, that I'm well-versed in forming bond

 3     packages --

 4          THE COURT:  Sure.

 5          MR. MARQUETTE:  -- negotiating with prosecutors,

 6     getting involved with probation officers.  My hands are

 7     tied.  I don't have anything to work with.

 8          THE COURT:  Okay.

 9          MR. MARQUETTE:  If I did, I would --

10          THE COURT:  All right.

11          MR. MARQUETTE:  In fact, I have the prosecutor's

12     implicit consent to a reasonable package, but I don't have

13     any -- any meat.

14          THE COURT:  Okay.  Well, again, Mr. Connerton, I

15     think you're going to have to work with your lawyer to try

16     to come up with an approach to present to the Court.

17     That's the best I can do right now, okay?

18          All right.  There were some other issues that

19     counsel wanted to raise today, and it might make sense to

20     take those up.

21          MR. MARQUETTE:  If we could --

22          MR. McGARRY:  Yes, Your Honor.  I guess first, I

23     think the Court has covered it, but I just want to make

24     sure that it is clear.  We have some correspondence from

25     Mr. Connerton himself sent to victim witnesses, including

1 a 35-or-so page letter to one of the investors who's named

2 in the indictment, who I believe is referenced in Count 1

3 of the indictment.

4     MR. MARQUETTE:  Can we get the initials, please?

5     MR. McGARRY:  M.C.  I'll talk about the actual

6 act of communicating with the victims and witnesses

7 second, but the first point I want to make is

8 Mr. Connerton writes:  I am not afraid of trial, but it

9 will not be with my court-appointed attorney.  I was

10 fortunate to get him, he's a nice man -- the government

11 agrees with that point -- but he is not the mad dog for

12 trial, and he knows that, exclamation point.

13     My concern, and the reason for raising it, is

14 we've had some instances in this District where on the eve

15 of trial a defendant will then request a new counsel.  I

16 was in contact with Mr. Marquette, we've spoken almost

17 daily for the last, you know, week or so, with the

18 exception of the holiday, and Mr. Einhorn's name came up.

19 I called Mr. Einhorn, who I know from other cases.  He

20 indicated, yes, he in fact had been in discussions with

21 Mr. Connerton.  Again, I don't try to get in between what

22 the propriety of seeking a new lawyer when one has a CJA

23 lawyer.  I spoke to Mr. Einhorn, and he indicated that he

24 was wide open in May, that would not be a problem.  But my

25 concern is if there is a new lawyer coming in, that he or

1    she come in sufficiently soon so that, again, the trial is

2    not moved.  And I say that because there are victims,

3    there are witnesses who do reach out to our victim witness

4    coordinator or reach out to the agent and say, Am I going

5    to have to testify, when is it going to be, and they want

6    to know.  They would like some resolution on this.  So I

7    think keeping that trial date is important, which is why I

8    mentioned if there's a potential for switching counsel,

9    that it be attended to with some urgency.

10            THE COURT:  Yes, we should take that up today.

11   So let me say a couple things.  We are going to stick to

12   this trial schedule, May 9.  Mr. Connerton has indicated

13   that he wants a speedy trial.  I want a speedy trial.  I

14   think this is about as good as we can do in terms of

15   having sufficient time.  But if we're going to switch

16   lawyers, we need to do that immediately.  Otherwise, the

17   new lawyer is not going to have time to be ready, and I am

18   not going to postpone the trial.

19            So let me say a couple things, Mr. Connerton.

20   First off, CJA lawyers, one, are very good.  They're

21   screened.  They're experienced.  They're reviewed.

22   Annually, the judges basically cull the list of lawyers

23   who should not be on the CJA list because we expect and

24   demand high-quality representation from CJA lawyers.  So

25   I'm just going to do that as a preface.

```
1              Point two is you get a CJA lawyer when you can't
2    afford to hire a lawyer, but you don't get to pick your
3    CJA lawyer.  So if you and Mr. Marquette are having a
4    breakdown in your communications or he's otherwise unable
5    to satisfy your needs for a defense lawyer, then you ask
6    for a new CJA lawyer, and that will come off of a random
7    list.  You don't get to pick your CJA lawyer.  So to the
8    extent that Mr. Einhorn is somebody that you're looking
9    to, if you want to hire him, great, that may imply that
10   you can afford to hire counsel and may have to reimburse,
11   frankly, the CJA program for Mr. Marquette's fees.  That's
12   a different issue.  But my point is, you can hire anybody
13   you want to hire that you're able to hire, you can
14   represent yourself, or you can take the appointed -- the
15   lawyer who is given to you off the CJA system.
16              THE DEFENDANT:  Well, I have -- I have no
17   intentions of representing myself --
18              THE COURT:  Okay.
19              THE DEFENDANT:  -- obviously.  The reason --
20   I've never had a court-appointed attorney.  I'm used to
21   paid attorneys.  I'm used to being in a position
22   financially where I can -- where I can achieve that.  The
23   SEC starved me out, and, you know, I was even -- I even
24   had other people that were ready to come in; and, I mean,
25   the whole thing, the whole dimension of this thing has
```

1  just overwhelmed me, as you can well imagine.  But, you

2  know, my -- my access to Mr. Marquette has been pleasant

3  but limited.  And we've only met, what, three times?

4          MR. MARQUETTE:  Five.

5          THE DEFENDANT:  No, twice --

6          MR. MARQUETTE:  Five.  More than enough.  I mean

7  enough.

8          THE DEFENDANT:  Three times.  I think it was

9  three.

10          THE COURT:  Well, okay, but --

11          THE DEFENDANT:  And I -- and I -- but I talked

12  to some people about backgrounds.  My thought was that

13  Mr. Marquette's background perhaps is more in the area of

14  drugs.  This is not a drug issue.  This is -- I don't know

15  if he's ever done a fraud case.  I haven't really talked

16  to him that much.  We kind of -- we spent a lot of time

17  the other day together, and it was -- it was very good.

18  And, yes, I am talking to other people.  My biggest issue,

19  once again, is resources.

20          THE COURT:  Okay.  But I just want you to

21  understand a couple things.  One is the timing.  So the

22  longer you wait, the more you're disadvantaging yourself

23  because your lawyer will not be as prepared.  So if you

24  change lawyers in February, that gives the new lawyer very

25  little chance to prepare, meaning for your trial.

1          THE DEFENDANT:  I -- I don't have any feeling

2     for this.

3          THE COURT:  Right, that's what I'm trying to

4     explain.  So if you are dissatisfied for some reason and

5     you want to hire somebody else, you better do it quickly.

6     That's my point.  This is going to be a massive

7     undertaking by whoever does it, and they need to get

8     started.  So if you're dissatisfied with Mr. Marquette,

9     and I'll tell you again, the CJA lawyers in the federal

10    court, it may not be true in state courts, but in the

11    federal court the CJA lawyers are the best defense lawyers

12    in the state, period.

13         THE DEFENDANT:  I'm -- I'm not expressing a

14    dissatisfaction.  I'm -- I'm -- I mean, I've just been

15    overwhelmed by the whole process.

16         THE COURT:  Yes, sure.

17         THE DEFENDANT:  I mean, even -- even the fact

18    that, you know, I was looking at some of the discovery, at

19    some of the conversations that, you know, the government

20    has gone and talked to the glove companies.  I mean, I

21    don't mind if they ask questions about things, but I think

22    a lot of it has to do with the way questions are asked.

23    And -- and I see what's happening here almost as the

24    government is putting me in a position with actually the

25    various glove companies of them being afraid.  There's a

1     fear of the fed.  I mean, every --

2             THE COURT:  Well, okay, but that's a different

3     issue.  I mean, right now we're trying to figure out your

4     representation; and so what I'm saying to you is this:  If

5     you believe that you cannot have adequate representation

6     by Mr. Marquette for whatever reason, you're not getting

7     along or you're concerned about his qualifications or

8     whatever, you can have a new CJA lawyer, but you don't get

9     to pick that lawyer.  It's whoever pops up off the

10    computer list.  And, frankly, you can do this once.  If

11    you're not satisfied with your next lawyer, it's too bad.

12            THE DEFENDANT:  Well, I haven't thought about

13    that yet, but I have talked to some people.

14            THE COURT:  Okay.  And if you want to hire -- if

15    you're able to hire somebody, my suggestion to you is to

16    hire them quickly.  Mr. Marquette, I'm sure, would

17    cooperate in providing whatever he's been able to discern

18    about the case so far, and provide discovery, and so

19    forth.  But if you're going to pull that trigger, you need

20    to pull the trigger, because we're not going to postpone

21    the trial because you decided on April 1 to hire a new

22    lawyer and that person says, "I can't get ready."  I'm

23    telling you now, if you're going to pull the trigger, you

24    need to pull the trigger because that's -- it's not

25    something that's going to delay the trial of the case.

1          THE DEFENDANT:  I mean, even the science, if I

2     look at the science in this case, Your Honor, I always

3     knew that this sale to one company or two companies, and I

4     even have a format now for how I intended on selling the

5     technology in light of all that's going on, and it has to

6     be a collaborative sale.  You know, the science is not

7     something you put in a box, and you seal it, and it's in

8     there, and it's done.  It's -- it's a development process.

9     I believe that I've done the science to the point of

10    development, including the patent pending, where I can

11    sell it.  But when I hear and see the conversations that

12    have taken place, the questions that have been asked and

13    the fact that people are going to be testifying here, and

14    here I'm trying to sell it, I'm still hopeful that I can

15    sell it before May.  I mean, that's where I am in my mind.

16         THE COURT:  Sure, okay.  All right.  That's your

17    issue, frankly.  I mean, I --

18         THE DEFENDANT:  It's my responsibility to my

19    investors.

20         THE COURT:  Fair enough.  But my responsibility

21    is to get this case to trial and to make sure that you

22    have adequate representation.  So my counsel to you is

23    to -- is to decide quickly who's going to represent you

24    and get going because otherwise you're going to be facing

25    trial with a lawyer who is less than fully prepared, which

1    is a very dangerous thing to do.  So that's my advice to

2    you on the --

3              THE DEFENDANT:  Thank you.

4              THE COURT:  -- on the counsel issue.

5              MR. McGARRY:  Your Honor, another issue that we

6    raised in --

7              THE COURT:  Let me just follow up on the other

8    one that you raised, which is the contact with the

9    victims.

10             MR. McGARRY:  Yes.

11             THE COURT:  All right.  So what is the

12   government proposing?

13             MR. McGARRY:  Well, to answer your question, I

14   would propose that we provide Wyatt with a list of the

15   names of the victims and witnesses, many of them are the

16   same, and that Mr. Connerton not have contact with them

17   without his attorney on the phone.  And the reason I

18   mention that is we said that to Judge Garfinkel on the

19   transcript, when I articulated that there needs to be some

20   assurances that Mr. Connerton is not going to be reaching

21   out by email, by telephone, by other electronic media to

22   the victims, to other potential victims to try to raise

23   money.  We said general communications with friends was

24   fine but not to investors, not to victims.  I articulated

25   that there's some danger to the community in the sense of

1    possibly contacting victims, possibly violating the

2    Court's order.  And that's from March 13.

3         And what we have, both in writing and on

4    recorded phone calls, is Mr. Connerton calling and

5    reaching out to the victims, many of whom are trial

6    witnesses, and he's talking to them, and he's

7    articulating, I'll call it politely, his version of the

8    facts.  He's articulating and telling them, you know,

9    potentially issues of what his defense are going to be.

10   He's planting seeds.  He's saying things that, frankly, I

11   believe are not true, that he's saying the FBI is saying

12   this, and the FBI is saying that.  For instance --

13        THE COURT:  Well, I concur that it is not a good

14   idea for Mr. Connerton to be making one-on-one contact

15   with victim investors, at least if the victim investors

16   don't wish to be contacted by him.  So it seems to me

17   among those investors may well be friends or relatives,

18   and if they indicate that they're happy to hear from

19   Mr. Connerton, I'm not sure why that would be an issue.

20        MR. McGARRY:  I think it would be an issue, Your

21   Honor, not if he's saying, Hello, how are you, how are

22   things, how are your kids, but when he starts to say

23   things about, you know, trying to discredit the FBI agents

24   or trying to say, you know, here's the situation, I did

25   this, I never did that, don't you remember this?  For

1    example -- and this is a hypothetical -- but don't you

2    remember before you gave me money, I told you all -- I

3    made all material disclosures to you, and I answered all

4    your questions?

5           And someone says, Well, I don't remember.

6           Yeah, I told you everything you wanted to know,

7    and you said, Here's my money.

8           THE DEFENDANT:  That was never said.

9           MR. McGARRY:  It was a hypothetical.  That you

10   can't try to change someone's recollection by having

11   lengthy, repeated conversations with them, trying to tell

12   them what they should remember about what happened years

13   ago.  That's why, when we meet with people, we take notes

14   and we write it down.  That's why we put some people in

15   the grand jury.  That's why when a witness comes here,

16   they're asked their recollection.

17          And, for instance, Mr. Connerton writes:  My

18   attorney yesterday told me about their discovery -- in

19   quotes -- that I'm going to see it soon.  I asked him what

20   was in there.  His comment, nothing.  It is a

21   he-said-she-said hearsay.

22          Well, he's writing this to a witness, to a

23   victim, that put the imprimatur of his attorney on the

24   quality of the discovery, making it sound like it's a

25   he-said-she-said, and this woman is getting a 30-page --

1    40-page document.  He also goes on: We have to work to do

2    or we are going to lose our investment.

3              So, again, now he's telling her we have to work

4    together or we're going to lose our investment, which

5    would go to, you know, bias or her, you know, her tendency

6    to, you know, maybe not give candid testimony because she

7    thinks she might lose her investment.  The point being --

8              THE DEFENDANT:  That's true, Your Honor.

9              MR. McGARRY:  So he also says:  When they

10   searched the apartment and office, they took Jean's ring

11   off her finger.  I paid for that with, quote, my money,

12   close quote, exclamation point.

13             The fact that a diamond ring, which Ms. Erickson

14   not only -- that the federal magistrate gave probable

15   cause to seize as evidence of the crime, and Ms. Erickson

16   has in this courtroom, I believe, acknowledged in her plea

17   agreement that she was going to forfeit any right to that

18   ring, that's not in here, of course, and it's making it

19   sound --

20             THE DEFENDANT:  It's not her ring.

21             MR. McGARRY:  -- it's making it sound as if the

22   FBI agent did something wrong.  And that's why we don't

23   have defendants communicate with victims.  We have

24   attorneys present who are -- who are members of the bar,

25   officers of the court, who are not going to be trying to

1    influence someone's testimony.  And this is just one

2    example.  And we have other -- and at the last page he

3    says:  Margaret, I am going to ask that you forward this

4    letter to the people below, and he also asks, I will get

5    you a list of investors.  Someone has to set up -- step up

6    and not be afraid.  Please do so with your group, too.

7    This is the truth.  Division will achieve nothing.

8            So he's asking her to then forward things to the

9    other investors, which is clearly, I think, not envisioned

10   by the rules of evidence.  I don't think it was envisioned

11   by Judge Garfinkel.  There was a hearing in front of Judge

12   Garfinkel where we talk at length, as I quoted, about not

13   contacting victim investors; and the fact that we were

14   able to get a copy of this, we have a copy of the phone

15   calls, you know, it appears to be witness tampering.  It

16   could be conceived of as witness tampering.  But, you

17   know, and we didn't add charges of witness tampering.  But

18   it just seems to me that it can be avoided.  If he has --

19           THE COURT:  No, I agree.

20           Mr. Connerton, you should work through Mr.

21   Marquette.  I mean, obviously he's in a position to

22   contact witnesses on your behalf, and we don't want you

23   getting in deeper water, frankly.

24           THE DEFENDANT:  Well, I'm -- I'm not looking to

25   get in deeper water, but when I have 50 investors go to a

1    presentation in Greenwich and -- I pride myself on the

2    fact that I have very good, up until this SEC matter, a

3    very good relationship with my investors.  I keep in

4    contact with them on a regular basis.  I put out investor

5    updates.  I call them.  I call all of them at Christmas.

6    I have done everything I can do to have a rapport, which

7    is above and beyond that of an investor relationship.  I

8    pride myself on my openness.  That's another thing.

9         Well, just to go back, I mean for people to say that

10   what happened in Greenwich was a setup, it sickens me.  It

11   sickens me.

12              THE COURT:  Okay, but --

13              THE DEFENDANT:  And if I may, Your Honor,

14   this -- this thing about, you know, the investors, to

15   question whether or not this has been an open book company

16   or not, this has been nothing other.  I mean, I know these

17   are allegations, Your Honor, but, you know, these people,

18   most of them I consider my friends.  I don't -- or they

19   become my friends.  And a lot of their lives have changed.

20   We've lost husbands and wives -- not wives, excuse me, I

21   take that back -- husbands, and people's financial

22   situation since they've invested --

23              THE COURT:  Right.

24              THE DEFENDANT:  -- have changed, having gone

25   through the --

1            THE COURT:  Yes.  What --

2            THE DEFENDANT:  -- 0809 thing.

3            THE COURT:  What we're talking about is a really

4   limited issue, and that is your contact before trial with

5   people who are going to be witnesses at the trial.

6            THE DEFENDANT:  I -- I can tell you, I do not

7   try to change their opinion --

8            THE COURT:  That may be --

9            THE DEFENDANT:  -- of what they've been through.

10  What he just said as far as a hypothetical --

11           THE COURT:  That may be true.

12           THE DEFENDANT:  -- that doesn't happen.

13           THE COURT:  That may be true, but you want to --

14  it's like if I have a case where somebody says, "Oh, you

15  can't be fair, Judge, because" -- whatever -- "you go to

16  the same country club as one of the lawyers," well, it may

17  not affect me, but somebody might perceive that it affects

18  me, and so I have to think about that.  You have to think

19  about the perceptions here.  If you're contacting

20  witnesses and sending them lengthy letters or having

21  lengthy phone calls with them in what can be -- in what

22  can be argued as an effort to change their recollection or

23  have them testify differently, that's problematic for you.

24  You're going to be made to look like a bad guy.

25           THE DEFENDANT:  I understand your point.  I can

1    only say that I believe that their opinion of me is well

2    formed, up until --

3              THE COURT:  Okay.

4              THE DEFENDANT:  -- this.

5              THE COURT:  Okay.  Well, but this is what we

6    all --

7              THE DEFENDANT:  Which came out of the air.

8              THE COURT:  Well, we all have to do this now.

9    My point is this:  I'm going to enforce the order that

10   Judge Garfinkel already made, that you shouldn't be

11   contacting the witnesses or investors --

12             THE DEFENDANT:  But I have contacts that I

13   maintain now --

14             THE COURT:  -- directly.  You should not contact

15   them directly.

16             THE DEFENDANT:  Any of them?

17             THE COURT:  Anybody who's an investor or a

18   witness should not be contacted by you directly.  You can

19   contact them with your lawyer.

20             THE DEFENDANT:  I can't do that, Your Honor.

21             THE COURT:  You can have your lawyer contact

22   them.

23             THE DEFENDANT:  I mean, I have -- I have one

24   woman that I talk to weekly, if not more, that is one of

25   my investors from 2007, and she has been a mainstay of

1    support for me since my incarceration, spiritually and

2    otherwise.  I can't imagine -- that's the whole thing with

3    this entire matter, is all of a sudden, you know, these

4    people that I've had this rapport, I'm cut off from them.

5              THE COURT:  Well, you're not --

6              THE DEFENDANT:  I can't imagine not talking to

7    Sarah.

8              THE COURT:  Okay.

9              THE DEFENDANT:  Through Mr. Marquette, I will

10   not do it.

11             THE COURT:  Okay.  Well, you need to do it.

12   That's the order.  And so if you want modification of that

13   order in some way, again, the way to do that is have your

14   lawyer file a motion with the Court, presumably after

15   conferring with the government, and it may be that there's

16   somebody like Sarah who is okay to contact.  But right

17   now, I can't decide that.  So you need to talk with your

18   lawyer, have your lawyer make a motion after speaking with

19   the government.  Perhaps you can get some relief.  Right

20   now I'm ordering no contact directly, only when your

21   lawyer is present, or through your lawyer.  And then

22   you'll seek exceptions to that if you think they're

23   appropriate, and if I approve the exception, then you're

24   okay.  But right now I can't deal with, on the spur of the

25   moment, who's an exception, appropriate exception, and who

 1    isn't.  That's why we do things formally.  Have your

 2    lawyer make a motion.

 3           Okay, what else do we need to take up today?

 4           MR. MARQUETTE:  We can go on to discovery.

 5    Mr. Connerton would like paper copies of all discovery.

 6           THE COURT:  Right.

 7           MR. MARQUETTE:  Including 302s, grand jury

 8    minutes, etc.  I've discussed that with Mr. --

 9           MR. McGARRY:  McGarry.

10           MR. MARQUETTE:  -- McGarry, thank you, and

11    he's -- he objects to that.  And Mr. Connerton is firm.

12    He wants paper copies, single- sided only, and he wants

13    them for his review at the facility.

14           THE COURT:  Right.  Well, I mean, that's not

15    really going to be possible because when something is in a

16    hard copy, it starts circulating within Wyatt.

17           THE DEFENDANT:  I wouldn't do that.

18           THE COURT:  Well, I know, but it's just the

19    rule.  And the fact -- the fact that there's a rule,

20    there's a speed limit, and if you say, "Well, I wouldn't

21    go faster than the speed limit," you're still subject to

22    it.  You know, that's the rule.  And so the point is Wyatt

23    has a process, a program set up for you to review the

24    documents electronically.  That's in order to maintain

25    control over them.  A 302 from the government could affect

1    not just you but somebody else, and if it's out there

2    circulating, it's a dangerous thing.  So we're going to

3    have to stick with the standard process in terms of

4    reviewing documents.

5            MR. MARQUETTE:  Also, your Honor, Mr. Connerton

6    has asked me to file a motion to dismiss.  Under the

7    rules, the instance when a motion to dismiss can be filed

8    and granted are extremely limited.

9            THE COURT:  Right.

10           MR. McGARRY:  I've explained this to him.  I've

11   explained it to Mr. McGarry also.  Here we are.  He's

12   still demanding me to do that, and I said I will not.  So

13   I just wanted to have the Court address, if possible,

14   about the scope of what a motion to dismiss does.

15           THE COURT:  Sure, okay.  What's the claimed

16   basis of the motion to dismiss?

17           MR. MARQUETTE:  If I can, I believe

18   Mr. Connerton will say that the indictment is full of lies

19   and innuendos.

20           THE COURT:  Okay.  Well, I tried to explain this

21   earlier.  That's what you have to prove at trial.  With a

22   motion to dismiss, I have to look at the indictment and

23   assume it's truth and decide whether there's some legal

24   error or some legal problem with it, which is a very, very

25   limited review at the motion to dismiss stage.

1     THE DEFENDANT:  I mean, when I was done with the

2    SEC matter and resolved the settlement issue, I was under

3    the impression that the only way that I could be indicted

4    was if they made it up, and in my opinion that's exactly

5    what happened, they made it up.  And -- and I look at

6    this, and I can't believe what I read, the perception that

7    I was -- that I have nothing scientifically.  The science

8    doesn't lie, the context of the science.  I think what I'm

9    dealing with are some people in the prosecution that don't

10    understand the science.

11     THE COURT:  Well, you know --

12     THE DEFENDANT:  They have ignored the science.

13    If you took the science --

14     THE COURT:  Right, but here's the problem.  The

15    science, your version of the science is not in the

16    indictment.  And so what you're doing --

17     THE DEFENDANT:  That's obvious.

18     THE COURT:  -- you're asking me to make a

19    finding of fact outside the corners of the indictment as a

20    basis for dismissing the indictment.  This is a

21    disagreement.  You take one position; the government takes

22    another position.  That's just not -- that's just not a

23    basis at this stage of the case for dismissing the

24    indictment.  I can't make that.

25     THE DEFENDANT:  Mr. McGarry asked me to do a

1  paragraph-by-paragraph response, which I have here --

2         THE COURT:  Right.

3         THE DEFENDANT:  -- I was prepared to hand over

4  to you.  It's what he has and we have, and in response to

5  that a technical narrative --

6         THE COURT:  Right, and that's your defense, and

7  that's why we need to get to trial.  So at trial that's

8  what you present.  Through witnesses and documents, and so

9  forth, you present that defense, and you show that the

10  government is unable to prove what it alleges.  That's

11  your defense.  But I can't take up a defense now.

12         THE DEFENDANT:  I mean, I can't even imagine why

13  the government would -- would want to destroy the patent

14  application.  That's what's happening.

15         THE COURT:  Okay.

16         THE DEFENDANT:  A patent application is

17  potentially -- that's gone since 2008 in its final form,

18  it's going to be destroyed as part of this process.  Is

19  that really what the government wants?

20         THE COURT:  I don't know; and, frankly, it's not

21  my concern.  You know, I'm not here to figure out the

22  motives of the government.  The consequences from a

23  prosecution can be extreme.  I acknowledge that.  But --

24         THE DEFENDANT:  I mean --

25         THE COURT:  -- the government has made -- they

1    brought a superseding indictment that we talked about

2    today, and you have defenses, apparently, to it, and

3    that's what we need to get to trial for.

4              THE DEFENDANT:  We were in the process of

5    selling it.

6              THE COURT:  Yes, okay.

7              All right.  What else do we need?

8              MR. McGARRY:  If I can just respond briefly.  We

9    did have discussions with Mr. Marquette.  We also had

10   discussions with a Jonathan Klein prior to indictment,

11   with Mr. Connerton present, to basically lay out the

12   evidence, as we sometimes call a proffer, and the

13   financial aspect of the case.  There was no resolution.

14   An indictment came down.  We met with Mr. Marquette, and

15   we also did say to Mr. Marquette, Look, we'll meet with

16   him again, but put something in writing as to, you know,

17   why -- basically what have we gotten wrong, and we'll --

18   we'll consider meeting to see if there's -- you know, if

19   there's a plea or if there's something that we can work

20   out or we're missing something, in essence, his version of

21   the case.

22              What our concern was, also, is that we needed to

23   have it on the record, either with a court reporter or a

24   videographer or something, because we were concerned that

25   were there not a record of the conversation, Mr. Connerton

1  would perhaps not credit the memorandum of interview; or

2  if an agent were to testify, "Well, that's different, in

3  May he's saying something different than he said in

4  December."  Well, that's why we thought we should try.

5       Now, our office, I spoke with our IT folks; they

6  won't video.  And it seems like to a large extent we're

7  getting on the record, with our hard-working court

8  reporter, a lot of what I think he wanted to tell us.

9  This was before we learned about the statements that he

10  made about the FBI and the government.  Now we're even

11  more concerned about even going down that road because, as

12  he wrote to Ms. -- to victim M.C.:  I'm attempting to get

13  a dismissal from this proffer process.  I am taking them

14  to school.  They do not understand the patent process at

15  all.

16       Again, this was sent to a victim, discrediting

17  the government and what have you.  And it concerns us now

18  that he's using what our efforts are to work well with

19  Mr. Marquette to try to come up with a resolution and

20  trying to use that to his advantage to somehow influence

21  the victims.

22       We also thought that, you know, could that

23  resolve in the case.  He also writes:  Of the 60

24  paragraphs in the indictment, 47 of them are lies, they're

25  distortions of what was said and for what reason in the

1    counts are lies, exclamation point.  I will never plead,

2    exclamation point.  Which, you know, to our sense, Your

3    Honor, almost makes any sort of attempt to meet with

4    Mr. Marquette, as reasonable as Mr. Marquette might be, a

5    fruitless exercise in that it would be -- it would just be

6    wasting everyone's time.

7            So I say that by way of a response, you know, to

8    his saying that we asked him to write.  Yes, we did say,

9    Tell us, write it down.  He did.  That was under proffer

10   protection.  We told Mr. Marquette we wouldn't use that as

11   direct evidence, we wouldn't use that in our direct case

12   as a statement; but if he testifies to something

13   different, we reserve the right to introduce his

14   statements, the ones that he already made, in

15   cross-examination.  So I just wanted to put that on the

16   record.

17           I think the last issue, Your Honor, that we

18   wanted to at least raise to the Court, and if you want us

19   to put it in writing we're happy to do that, is that

20   Mr. Connerton has frequently said, "Well, my lawyers

21   screwed up.  It was the paralegal.  They didn't do the

22   securities filing correctly.  It wasn't my fault.  I hired

23   the best lawyers."  As we heard today, "I hire the best

24   patent lawyers.  My patent lawyers were in charge of this.

25   My securities lawyers were in charge of that."  And my

1   reason for raising this to the Court is we believe if he's

2   going to take the defense that, you know, my lawyers and

3   their paralegals screwed up, that that is, in essence, an

4   advice of counsel defense.

5           Now, I am pretty confident that the lawyers

6   would never say, you know, if we were to approach them,

7   without at least having a clear waiver of the

8   attorney-client privilege, as to the securities lawyers

9   and as to the patent lawyers, that they wouldn't talk to

10  us.  We haven't approached them.  We haven't endeavored to

11  interview them.  There was some allusion to that earlier

12  on in this hearing today.  We did not approach his patent

13  lawyers, and we haven't.  But if he's going to continue to

14  use that as a shield, we believe that that's an advice of

15  counsel defense, which would trigger a waiver of the

16  communications, of the attorney-client communications, and

17  through the discovery process, in the run-up to trial, we

18  would have the opportunity to see their communications, to

19  interview them so that neither side has trial by ambush,

20  and that prior to someone taking the stand, the parties

21  know what their testimony would be as to what advice they

22  did give Mr. Connerton about filing securities

23  regulations, filing a Reg D, whether or not you could only

24  raise up to a million dollars, whether or not your

25  disclosures had to be complete and accurate and truthful

 1    when you were talking to investors.  And I suspect that

 2    the securities lawyers would say, We told him that his

 3    disclosures had to be truthful and accurate and correct

 4    when raising money.

 5            But if he's going to go down that road of

 6    blaming the lawyers, then we would be filing a motion, if

 7    it's an oral application today or if you want me to put it

 8    in writing, that that is going to trigger a waiver of the

 9    attorney-client privilege in that regard.

10            THE COURT:  Well, I think it's a very serious

11    issue, a very serious decision --

12            MR. McGARRY:  Yes.

13            THE COURT:  -- whether Mr. Connerton is going to

14    raise an advice of counsel defense.  So I think it should

15    be first a question that's discussed obviously between

16    counsel and Mr. Connerton --

17            MR. McGARRY:  Right.

18            THE COURT:  -- but then perhaps between the two

19    of you.  I would like to do that formally.

20            MR. McGARRY:  That's fair.

21            THE COURT:  And, you know, if there is a knowing

22    adoption of an advice of counsel defense, then it does

23    have the impact of or the effect of waiving

24    attorney-client privilege.  So that's something that

25    Mr. Marquette and Mr. Connerton are going to need to

1    discuss carefully.  I'm not going to take it up today for

2    that reason.  But there should be a very careful,

3    thoughtful and clear determination of whether that defense

4    is being raised, and if so, what the impact of it is.

5          So motion by one side or the other, maybe a

6    motion by the government would stimulate the decision, but

7    it's not something I'm going to take up today.

8          MR. McGARRY:  Thank you, Your Honor.

9          THE DEFENDANT:  Your Honor, I -- I can -- I

10   filed two Form Ds.  The 506 was filed by Day Berry &

11   Howard, and I had no problems with the counsel that I

12   received and the instruction relative to that level of

13   Form D.  When I wanted to raise up to $5 million, I was

14   advised that I should go to a 506, when in fact it

15   probably should have been a 505.  And my settlement with

16   the SEC is cornered around the date of the filing of the

17   506.  Clearly, I was ill-advised, and I'll go on the

18   record with that, and clearly there was a paralegal

19   dropoff there which, you know, I have on my computer the

20   handwritten notes of the partner, the billing statements,

21   the correspondences interoffice between the paralegals,

22   and no one files a 506 D for $350,000.  It takes you to

23   infinity, I believe.  And the level of disclosure is way

24   beyond that.

25          So it was clearly, in that particular instance, an

1    issue of a problem within the firm, Wiggin & Dana, which

2    is once again on the advice of my previous counsel I went

3    to Wiggin & Dana with that, and I was not advised

4    properly, and I was not even provided adequate execution

5    of the filing.  That was what my whole settlement with the

6    SEC was about.  It cornered on that date, that all the

7    money that was calculated in the -- in the repayment was

8    all the funds that were raised since the date of that

9    filing.  It was all -- that was the cornerstone of that

10   settlement agreement.

11        My intention was to, you know, sign that agreement

12   and get on with the sale of the technology.  Once again, I

13   looked at it as -- and under the advice of my counsel at

14   that time -- a reasonable way to get back to selling it,

15   which I can actually say I still believe could be done in

16   a matter of a couple months of negotiations with these

17   companies, but --

18             THE COURT:  Okay.  All right.

19             THE DEFENDANT:  -- it looks like I'm not going

20   to get there.

21             THE COURT:  Well, I don't know if you will or

22   not but --

23             THE DEFENDANT:  I didn't think it was part of

24   this case though, either.

25             THE COURT:  Well, what's the part of the case is

1    what information the government can seek in advance of

2    trial and present at trial, and that turns on whether

3    you're raising a defense to your wrongdoing based upon

4    advice that you received from lawyers.  And you can't say,

5    "I was just following what my lawyer said," and then

6    prevent the government from finding out what your lawyer

7    said.  That's the point.  And so --

8              THE DEFENDANT:  Well, I'm not -- you know, as

9    long as we're all speaking the truth here, I don't have

10   any problems with that.

11             THE COURT:  Well, okay, but it's an important

12   decision, so I want you to talk it over with Mr. Marquette

13   and make a formal decision about that because it will

14   affect the scope of the evidence that's admitted at trial.

15   It will affect, frankly -- your decision whether to raise

16   this defense is going to affect also your defense, you

17   know?  There's pros and cons to raising an advice of

18   counsel defense.  And so that's my only point.  So we're

19   not going to decide it today.  You two need to talk about

20   it, and then perhaps counsel can decide what the impact of

21   that decision is.

22             THE DEFENDANT:  The thing I feel a bit frozen on

23   right now, Your Honor, is, you know, being able to

24   communicate with Sarah, being able to communicate with my

25   cousin, my only relative that invested.  They're --

1          THE COURT:  Yes, I've told you --

2          THE DEFENDANT:  -- counting on me --

3          THE COURT:  I've told you how to raise that.

4     You raise that by motion, present it to the Court after

5     your lawyer speaks with the prosecutor.  Perhaps the

6     prosecutor will agree, and we can have a stipulation that

7     you're allowed to speak to your cousin, you're allowed to

8     speak to Sarah.

9          THE DEFENDANT:  I mean, I --

10         THE COURT:  If not, then you make the motion,

11    I'll get an objection or not, and then I'll decide the

12    motion; but I can't do it today.

13         THE DEFENDANT:  I understand that.  I even view

14    my -- my investors as potential bonders --

15         THE COURT:  Okay.  Well, all right.

16         THE DEFENDANT:  -- that I need to communicate

17    with.

18         THE COURT:  Well, or your lawyer does.  You can

19    communicate with them through your lawyer.  I'm not

20    restricting your lawyer from contacting your investors or

21    witnesses.  That's his job.  What I'm doing is saying you

22    can't contact them directly unless and until you get an

23    exemption or exception to the order.

24         THE DEFENDANT:  Okay.

25         THE COURT:  All right?  Okay.  Well, this has

1    been helpful.  Thanks very much.  We'll stand in recess.

2            MR. McGARRY:  And I do thank you, Your Honor.  I

3    know this is unusual, but hopefully this will save us time

4    in the long run.  I thank you and your staff.

5            THE DEFENDANT:  Thank you, Your Honor.

6            (Whereupon, the proceedings adjourned at

7    12:50 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

No. 3:17-cr-00047(SRU)

United States of America v. Thomas J. Connerton


       I, Sharon L. Masse, RMR, CRR, Official Court
Reporter for the United States District Court for the
District of Connecticut, do hereby certify that the
foregoing pages are a true and accurate transcription of
my shorthand notes taken in the aforementioned matter to
the best of my skill and ability.



               December 19, 2017


             /S/ Sharon L. Masse
          Sharon L. Masse, RMR, CRR
           Official Court Reporter
           915 Lafayette Boulevard
         Bridgeport, Connecticut  06604
            Tel: (860)937-4177