UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 3:18-CR-48 (VAB) |
| v. | December 21, 2018 |
| ROBERT V. MATTHEWS,<br>LESLIE R. EVANS, and<br>MARIA MATTHEWS | |

## GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS, TO TRANSFER VENUE, AND TO SEVER

The United States hereby opposes defendant Robert Matthews' Motion to Dismiss and to Transfer Venue, Docs. No. 71, 71-1 (hereinafter "R. Matthews' Motion"), defendant Maria Matthews' Motion to Dismiss and to Transfer Venue, Doc. No. 70, and defendant Leslie Evans' Motion to Dismiss and to Transfer Venue, Doc. No. 67 (hereinafter "Evans' Motion" or "Evans' Mot."), as well as defendant Leslie Evans' Motion to Sever, Docs. No. 68, 69, (hereinafter "Severance Motion" or "Severance Mot.").[1]

The motions should be denied in their entirety. The defendants' motions to dismiss erroneously claim that the wire fraud counts relate to efforts to spend money previously obtained by fraud. To the extent the charged wire fraud transmissions relate to money at all (and Counts One, Four, Seven and Eight are emails, not money transfers), those transfers furthered the fraud by placing EB-5 investor money out of the investors' scope of authorization. As such,

---

[1] Unless otherwise indicated, citations to the R. Matthews' Motion and the Severance Motion are to the accompanying memorandum of law. With respect to the M. Matthews' Motion and the Evans' Motion, the defendants did not file a separate memorandum of law and instead rely on the arguments contained in the R. Matthews' Motion.

1

defendants' motion to dismiss should be denied.   Defendants' motion for a convenience transfer of this case to Florida should also be denied because defendants' have failed to show that trial in Connecticut would be any more burdensome than a trial in Florida.   Finally the Severance Motion should be denied because Evans has not demonstrated that he is entitled to severance under Fed. R. Crim. P. 14(a).

## I.      Background

On March 14, 2018, a grand jury sitting in New Haven, Connecticut returned a twenty-count Indictment against Robert Matthews ("R. Matthews") and Leslie Evans ("Evans") charging violations of 18 U.S.C. §§ 1343, 1344, 1349 1957, and 2.   *See* Doc. No. 1.   On August 29, 2018, a grand jury sitting in New Haven, Connecticut returned a Superseding Indictment adding an additional count against R. Matthews and Maria Matthews ("M. Matthews") charging violations of 26 U.S.C. § 7201 and 18 U.S.C. § 2.   *See* Doc. No. 39.

The Superseding Indictment alleges a wide-spread and multi-faceted fraud that impacted money and property of individuals in foreign countries such as China and Iran, as well as in the states of Connecticut and Florida.   Counts One through Eight of the Superseding Indictment allege a wire fraud scheme whereby foreign investors, induced by the misrepresentations made by R. Matthews, Evans, and others, sent money that they thought would be invested in a property in Florida called the Palm House Hotel.   *See id.* ¶¶ 15–19.   R. Matthews and his co-conspirators, however, had other designs for nearly half of the money sent by the foreign investors.   In fact, and as alleged as part of the wire fraud scheme, R. Matthews, Evans and others diverted the funds to other accounts unrelated to the Palm House Hotel.   *Id.* ¶ 20.   Once the money was in these other accounts, the co-conspirators were then free to use the money for

their own purposes. For instance, as a part of and in furtherance of the scheme, R. Matthews, Evans, and others sent money to an account in Connecticut controlled by R. Matthews' brother, Gerry Matthews ("G. Matthews") where R. Matthews subsequently used it on personal expenditures. *Id.* ¶ 21. Also as a part of the wire fraud scheme, the co-conspirators diverted EB-5 money to purchase a Matthews' home out of foreclosure located at 115 Lower Church Hill Road in Washington, Connecticut through the use of a straw company and various accounts that concealed the true nature of the transaction from the foreclosing bank. *See id.* ¶ 22.

Count Nine of the Superseding Indictment alleges a bank fraud related to the purchase of the property located at 115 Lower Church Hill Road. R. Matthews, Evans, Nicholas Laudano ("Laudano") and others schemed and conspired to purchase the property, which the Matthews had just lost in foreclosure, from the foreclosing bank, JP Morgan Chase Bank NA ("JPMC"). Through affirmative misrepresentations, material omissions, the use of straw entities and other means, the co-conspirators hid from JPMC the true nature of the transaction: the property was purchased using money diverted from the Palm House Hotel for the benefit of R. Matthews, M. Matthews, and their family. Believing that the counterparty with whom they were dealing had no relationship to the Matthews, JPMC sold the property at a discount. Had JPMC known the true nature of the transaction, JPMC would not have sold the property.

Count Ten charges R. Matthews and Evans with conspiracy to commit wire and bank fraud based on the facts alleged in Counts One through Nine.

Counts Eleven through Twenty charge R. Matthews with illegal monetary transactions in violation of 18 U.S.C. § 1957. Evans is also charged in Count Twelve. These transactions are based on the movement of criminally derived proceeds of the bank and wire frauds among bank

accounts in Connecticut.

Finally, Count Twenty-One charges R. Matthews and M. Matthews with tax evasion.

### a. The Wire Fraud Scheme

R. Matthews, Evans and their co-conspirators took advantage of and defrauded foreign nationals who were hoping to obtain lawful permanent residential status through the EB-5 visa program ("EB-5 program"). As described in the Superseding Indictment, the particulars of the EB-5 program vary by project and location, but relevant for purposes of this matter, an investor was entitled to a lawful permanent residential status (or a "green card") if they invested $500,000 in a development project in the United States that ultimately employed ten or more individuals. *Id.* ¶¶ 6–7. R. Matthews, who had had a sordid history with the Palm House Hotel, *id.* ¶¶ 12–14, as well as Evans and their co-conspirators made misrepresentations to the EB-5 investors and others about the Palm House Hotel to induce them to invest in it. *Id.* ¶ 15. They included, among others, that the proceeds of the EB-5 investors would be used to develop the Palm House Hotel, that certain well-known individuals would be on the advisory board and that well-known entertainers, business people, and politicians would be "a part of the club" at the Palm House Hotel, and that G. Matthews was a member of the Palm House management team and was the 99% owner of the legal entity that owned the Palm House Hotel. *See id.* ¶ 17; *see also, e.g.*, Gov't Exh. A at 37 (misrepresentations about the advisory board in materials sent to foreign investors); Gov't Exh. B at 48–49 (misrepresentations about club membership in materials sent to foreign investors). As alleged in the indictment, these misrepresentations were not true. *Id.* ¶ 18.

Based on the misrepresentations made by R. Matthews, Evans, and others, the EB-5

investors sent money to the project. After passing through accounts controlled by an intermediary company known as South Atlantic Regional Center ("SARC"), the investors' money ended-up in one of two accounts: (1) an account in the name of 160 Royal Palm LLC at Regions Bank in Florida that was controlled by R. Matthews, Evans, and their agents or (2) into Evans' Interest on Trust Account ("IOTA account") at First United Bank in Florida. *Id.* ¶ 19. From there, the funds should have been used to develop the Palm House Hotel.

The Government anticipates demonstrating at trial that approximately $32 million of EB-5 money went into both of these accounts. From these accounts, however, only approximately $16.9 million were used for legitimate purposes related to the Palm House Hotel. The balance, more than $15 million, was diverted and ultimately used for the co-conspirators' – and primarily the Matthews' – own purposes.[2]

R. Matthews, Evans and their co-conspirators, in furtherance of their scheme, diverted the money into a number of different accounts in the name of other people or straw entities. *Id.* ¶ 20. And to be clear – these diversions were not the simple expenditure of the money – but part and parcel of the scheme itself. As described above, it was a part of the scheme to divert the money into an account controlled by G. Matthews and in the name of Matthews Commercial Properties ("MCP") from where it was then spent on personal expenditures. *Id.* ¶ 21. It was also a part of the scheme to divert money to purchase a Matthews' home out of foreclosure located at 115 Lower Church Hill Road in Washington Connecticut through the use of a straw company and various accounts that concealed the true nature of the transaction from the

---

[2] These numbers represent the Government's best approximation at this point, but may be revised before trial.

foreclosing bank.[3]   *See id.* ¶ 22.   In other words, once the money was diverted, R. Matthews then the fruits of his illicit labor.

As the evidence will demonstrate at trial, the co-conspirators' diversion of the EB-5 money caught up with them in the in the summer and fall 2014.   By then fewer EB-5 investors were investing, and the Palm House Hotel was still not completed.   As his fraud began to unravel, R. Matthews tried to maintain control over the Palm House Hotel to continue his scheme.   In addition to EB-5 investors who continued to send money as late as October 31, 2014 for investment into the Palm House Hotel, *see* Gov't Exh. C (EB-5 investor sending money for investment on October 31, 2014), R. Matthews also sought additional sources of funding.   *See, e.g.*, Tr. of Robert Viers Matthews (Jan. 31, 2017), Gov't Exh. D ("Matthews Vol. I SEC Tr.") at 185; *see also* Exh. E (investment memorandum for the Palm House Hotel circulated by R. Matthews in October 2014).   In October 2014, however, the minority owner and managing member of the Palm House Hotel began to question what had happened at the hotel and tried to assert control over the hotel.   R. Matthews – who had put the hotel in the name of his brother, G. Matthews – directed G. Matthews, to relieve the managing member of his position.   G. Matthews, who had had no involvement with the hotel prior to this time, obliged, and appointed Evans as managing member to keep the co-conspirators in charge of the hotel, to maintain their access to investor money, and to seek additional sources of investment.   *See* Doc. No. 39 at ¶ 25; *see also* Gov't Exh. F (letter removing managing member); Gov't Exh. G (email appointing Evans managing member).

---

[3] The specific circumstances of this transaction are discussed below in connection with the bank fraud allegations.

In furtherance of this wire fraud scheme, the defendants sent a number of wires.  *See* Doc. No. 39 at ¶ 25.  Count 1 of the indictment describes an email from R. Matthews' account in Florida to his brother G. Matthews' email account in Connecticut related to login instructions to bid on the property at 115 Lower Church Hill Road.  Count 2 is a wire from Evans' IOTA account diverting EB-5 money to a Connecticut account to be used for the purchase of 115 Lower Church Hill Road by the straw company.  Count 3 is a wire out of the 160 Royal Palm account diverting EB-5 money to G. Matthews' bank account in Connecticut which R. Matthews later used for personal expenditures.  Count 4 is an email sent from Connecticut that furthered the fraudulent purchase of 115 Lower Church Hill Road.  Counts 5 and 6 are wires out of the 160 Royal Palm Account diverting EB-5 money to G. Matthews' account in Connecticut for R. Matthews' personal expenditures.  Count 7 and 8 are the emails sent to and from Connecticut in which the defendants' seek to prolong their fraud scheme by removing a managing member of the Palm House Hotel who was questioning their use of funds and appointing Evans in his stead. *See* Gov't Exhs. F and G.

>   **b.    The Bank Fraud Scheme**

The Superseding Indictment also alleges that R. Matthews, Evans, and others, including Laudano, conspired to divert EB-5 money to purchase 115 Lower Church Hill Road (a home formerly owned by R. Matthews) out of foreclosure, while concealing the true nature of the transaction from the foreclosing bank, JPMC.

R. Matthews, M. Matthews and their family had owned or lived at 115 Lower Church Hill Road since at least 2001.  Doc. No. 39 at ¶ 27.  In September 2013, JPMC foreclosed on the property and put it up for auction through the use of a company called Ten-x d/b/a

Auction.com ("Auction.com"). *Id.* ¶ 29. This was despite R. Matthews' attempts to have JPMC refinance the property on more favorable terms for him as early as 2009. *See* Gov't Exh. H (R. Matthews letter asking to refinance his property).

The Superseding Indictment alleges that R. Matthews, Evans, Laudano, and others schemed to purchase the property out of foreclosure for R. Matthews anyway. In essence, the scheme operated as follows: (1) Laudano would use a shell company to purchase 115 Lower Church Hill Road out of foreclosure with diverted EB-5 funds for less than the amount R. Matthews owed; (2) R. Matthews would continue to live at the property and act as owner of the property; and (3) Laudano, R. Matthews, and Evans would conceal from JPMC the fact that Laudano was purchasing the property with diverted EB-5 funds provided by R. Matthews and that R. Matthews would continue to control the property, knowing that JPMC would not have sold the property to Laudano if it knew of the source of funds and Laudano's relationship with R. Matthews. Doc. No. 39 at ¶ 32.

To this end, R. Matthews, Evans, Laudano and their co-conspirators, agents, and others arranged the purchase of 115 Lower Church Hill Road from JPMC through a straw entity, NJL Development Group, LLC, that they had incorporated and which was controlled by Laudano. *Id.* ¶ 33–34. In February 2014, after bidding on and winning the property at auction, Laudano executed a sales agreement with JPMC to purchase 115 Lower Church Hill Road. *See id.* ¶ 35. Around that same time, R. Matthews, Evans, Laudano, and others caused a letter to be sent from Evans to Auction.com. The letter, signed by defendant Evans, stated:

> This email shall confirm that our firm is in receipt of cleared funds in the amount of $2,750,000.00 from Nick Laudano/NJL Development Group, LLC. As part of said transaction we will be wiring the amount of $136,237.50 to [the attorneys representing the bank] today.

Gov't Exh. I.   In fact, Evans' firm had not received $2,750,000 from Laudano or NJL Development Group, LLC.   Nor was Laudano or NJL Development Group, LLC ever a client of Evans' as this letter makes it appear.   Doc. No 39 at ¶ 36.   As a part of the scheme, the defendants caused $136,237.50 to be sent that same day to the banks' attorneys.   *Id.* ¶ 37. Eventually $2.65 million of EB-5 money was diverted from the 160 Royal Palm Account through a number of different accounts opened by Laudano and used for the purchase of 115 Lower Church Hill Road.   *See id.* ¶ 38–42.

### c.    Additional Charges

Based on the foregoing, R. Matthews and Evans were also charged with conspiracy to commit wire fraud and bank fraud in Count Ten of the Superseding Indictment.   *Id.* ¶¶ 43–44. Counts Eleven through Sixteen of the Superseding Indictment charge R. Matthews with illegal monetary transactions through Connecticut banks using diverted EB-5 funds from the 160 Royal Palm account and from the Evans IOTA account.   *Id.* ¶¶ 45-46.   Evans is also charged in Count 12 with illegal monetary transactions, as that particular count relates to the purchase of 115 Lower Church Hill Road.   R. Matthews is also charged in Counts Seventeen through Twenty of the Superseding Indictment with illegal monetary transactions related to the proceeds of the bank fraud.   *See id.* ¶¶ 47–50.   Finally, R. Matthews and M. Matthews are charged with tax evasion in Count Twenty-One of the Superseding Indictment.   *Id.* ¶¶ 51–53.

## II.    Motions to Dismiss

R. Matthews moves to dismiss Counts One through Eight of the Superseding Indictment for failure to state an offense under Fed. R. Crim. P. 12(b)(3)(B)(v), for improper venue under Fed. R. Crim. P. 12(b)(3)(A)(i), and for lack of jurisdiction under Fed. R. Crim. P. 12(b)(2).   His

argument for each of his Rule 12 motions is the same – namely, that the wire transmissions charged in Counts One through Eight were not made "in furtherance" of the charged scheme to defraud because they were "mostly part of the defendants' efforts to *spend* money that they allegedly obtained by fraud." R. Matthews' Mot. at 1.   This is not the case.

R. Matthews grossly mischaracterizes what the Superseding Indictment actually alleges. Counts One through Eight do not "mostly" or in any way involve the defendants just trying to spend fraudulent proceeds.   Instead, to the extent those wire fraud counts are based on transferring funds at all (and Counts One, Three, Seven, and Eight charge emails, not transfers of money, so it is hard to see how those counts could possibly constitute "spending"), such transfers were needed in order to move EB-5 money out of the victims' scope of authorization and into defendants' irrevocable control.   Because these transfers were an essential step in diverting the funds to defendants' personal benefit, they furthered the scheme to defraud.   Accordingly, R. Matthews' motions to dismiss should be denied in their entirety.[4]

 **a. Governing Law**

In order to convict a defendant of wire fraud under 18 U.S.C. § 1343, the Government must show: (1) that there was a scheme or artifice to defraud, (2) that the defendant participated in the scheme with fraudulent intent, (3) that there was a wire transmission, (4) that the wire transmission was in furtherance of the scheme, and (6) that the defendant caused that transmission.   *See, e.g., Schmuck v. United States,* 489 U.S. 705, 710–12 (1989) (construing

---

[4] Defendant M. Matthews purports to move to dismiss Count Twenty-One for tax evasion by incorporating all of the arguments made by R. Matthews in his motion to dismiss. *See* M. Matthews' Mot.   However, R. Matthews does not move to dismiss Count 21 or make any argument about venue being improper for the tax count so M. Matthews' motion should be denied.

§ 1341); *United States v. Guadagna*, 183 F.3d 122, 129–30 (2d Cir.1999) (construing § 1343); *United States v. D'Amato*, 39 F.3d 1249, 1256–57 (2d Cir.1994) (construing § 1341).

To be in furtherance of the fraud, the wire transmission "need not be an essential element of the scheme;" rather, it is sufficient if the transmission was "incident to an essential part of the scheme," or "a step in the plot." *Schmuck*, 489 U.S. at 710–11 (citation omitted). Transfers of funds may be deemed "in furtherance" if used to place the funds outside the scope of the victim's authorization and irrevocably under a defendant's control. *See United States v. Rude*, 88 F.3d 1538, 1542 (9th Cir. 1996) (finding defendants' inducing victim to wire money into an account over which defendants had power of attorney a "step in the scheme," but subsequent transfers out of that account were in furtherance because such transfers were needed to place funds outside of scope of victim's authorization and within defendants' own control).

Where the fraud scheme involves an "ongoing" or "large-scale operation," post-fraud transmissions may further the fraud if aimed at helping to keep the scheme in operation. *United States v. Slevin*, 106 F.3d 1086, 1090 (2d Cir. 1996) ("[w]here the frauds are not isolated or unrelated swindles, post fraud mailing of invoices, checks, or receipts may further the scheme by . . . helping to keep the scheme in operation by preserving a needed business relationship between a fraud victim and the defendant"). The important question in determining whether a post fraud transmission is in furtherance is from the viewpoint of the defendant, specifically, whether such a transmission "is part of the execution of the scheme as conceived by the perpetrator at the time." *Schmuck*, 498 U.S. at 715. If a defendant views the transmission as "in his interest" in keeping the scheme alive, the transmission may be deemed to further the fraud even though, in hindsight, the transmission may have proved counterproductive. *Id.*;

11

*Slevin*, 106 F.3d at 1091.

> **b.  Venue is Proper in the District of Connecticut as All Charged Wires Were In Furtherance of the Charged Scheme to Defraud.**

R. Matthews lumps Counts One through Six of the Superseding Indictment together claiming that they all relate to "spending the proceeds of a fraud." R. Matthews' Mot. at 7. Specifically, R. Matthews asserts that "[e]xcept for the emails to and from Gerry Matthews' email account upon which counts Seven and Eight are based, *all* of these wire transmissions pertain to the *use* of allegedly fraudulently obtained funds *after* Mr. Matthews and his alleged co-schemers obtained those funds from the alleged EB-5 victims and SARC." (emphasis in original).  *Id.*   This grossly mischaracterizes the charged scheme to defraud and what the wire fraud counts in the Indictment plainly state.

> **1.  Counts 1 and 4 Are Based on Emails in Furtherance of the Scheme to Purchase 115 Lower Church Hill Road, Not On "Spending."**

Contrary to R. Matthews' insistence otherwise, Counts One and Four are based on ___*emails*___, not on "spending" or any sort of flow of funds. Count One charges an email from R. Matthews to G. Matthews forwarding login instructions to bid on the 115 Lower Church Hill Road property at auction. Count Four charges an email to Laudano with documents related to the purchase of the 115 Lower Church Hill Road property.

Both of these emails represents a step in furtherance of the fraud relating to Laudano's purchase of the 115 Lower Church Hill Road property out of foreclosure using diverted EB-5 money for R. Matthews' benefit. R. Matthews makes no argument as to why these emails which either terminated in Connecticut (in the case of Count One), or originated in Connecticut (in the case of Count Four) are at all improper. The motion to dismiss as to Counts One and Four should

12

be denied.

**2. Counts Two, Three, Five and Six Charge Wire Transmissions Diverting EB-5 Funds, Not Spending of Already Diverted Funds.**

R. Matthews argues that the wire transmissions charged in Counts Two, Three, Five and Six are not in furtherance of the fraud because they pertain to the "*use* of allegedly fraudulently obtained funds *after* Mr. Matthews and his alleged co-schemers obtained those funds from the alleged EB-5 victims and SARC." R. Matthews' Mot. at 7. R. Matthews is confusing EB-5 money *available* for diversion with EB-5 money that has already been *diverted*. Money from EB-5 investors was deposited into either the 160 Royal Palm Account at Regions Bank or into Evans' IOTA account for use in developing the hotel. Once deposited, about half of the EB-5 money was used for developing the Palm House Hotel, but the other half of the money was *diverted* from its earmarked use and instead used for R. Matthews' personal enrichment. Stated differently, the fraud could not have been completed until after the moneys were diverted from the 160 Royal Palm Account or the Evans IOTA account. The wire transmissions charged in Counts Two, Three, Five, and Six are four instances where the defendants diverted EB-5 money from its earmarked use for defendants' own personal enrichment.

Count Two charges a transfer of EB-5 funds out of the Evans' IOTA Account, specifically, a wire for $136,237.50 to the Farmington Savings Bank in Connecticut for use as the down payment on the purchase of 115 Lower Church Hill Road. Paragraph 22 of the Indictment specifically alleges that the purchase of the 115 Lower Church Hill Road "out of a foreclosure auction with EB-5 money *diverted* from the PHH project by using a straw company, NJL Development Group, LLC, which was under the control of Laudano" as part of the wire

fraud scheme.   Until this $136,237.50 in EB-5 money was transferred out of the Evans' IOTA Account, it remained potentially available for its earmarked purpose and within the scope of the EB-5 investors' authorization and, as such, was not yet diverted.

Similarly, Counts Three, Five, and Six charge transfers of EB-5 funds out of the 160 Royal Palm Account by way of a wire for $8,592.40 (Count Three), a check for $12,717.46 (Count Five), and a check for $10,837.86 (Count Six), all payable to the MCP Savings account in Connecticut.   Paragraph 21 of the Indictment specifically alleges that G. Matthews, acting at R. Matthews' direction, used the *diverted* EB-5 funds in G. Matthews' MCP Savings account for the benefit of R. Matthews and M. Matthews . . . ."   Again, until these EB-5 funds were transferred out of the 160 Royal Palm Account, they remained available for their earmarked purpose and within the scope of the EB- investors' authorization, and therefore, and not yet diverted.

R. Matthews' argument that any movement of EB-5 money out of the 160 Royal Palm Account or the Evans' IOTA Account constitutes "spending" of fraud proceeds after the fraud has reached fruition is plainly wrong.   It was not until EB-5 money was diverted for R. Matthews' personal benefit that the money was irrevocably in R. Matthews' possession and, as such, the scheme could not have reached fruition before that point.   Indeed, as the Indictment makes clear, the success of the scheme depended upon the successful *diversion* of EB-5 funds for R. Matthews' personal benefit, not just obtaining the funds from the EB-5 investors.   Until the diversion, those funds were available (and some were used) for legitimate development purposes.

This case is similar to *United States v. Rude*.   There, the defendants induced Unity House, a non-profit company in Hawaii, to wire $10 million to a Credit Suisse account over

which the defendants had power of attorney. 88 F.3d at 1542. The defendants assured Unity House that the money would stay in the Credit Suisse account earning interest. *Id.* The defendants then wired the money to their own account in the United States at Seafirst Bank. *Id.*

The defendants in *Rude* were charged with and convicted of wire fraud, not for the initial transfer of Unity House's money into the Credit Suisse account (over which they had power of attorney), but rather, for the later transfers out of the Credit Suisse account and into the defendants' personal account at Seafirst Bank. The Ninth Circuit affirmed, stating that:

> Regarding the transfers from the Credit Suisse account to Seafirst, the defendants overlook the fact that their fraud was not complete until the $10 million deposited in Credit Suisse (in Unity House's account) was within their complete control. Unity House was falsely promised that its money would remain in the Credit Suisse account. Although effecting a transfer to Credit Suisse was a step in the scheme, the final steps did not occur until defendants effected transfers to and from the Seafirst account, thus placing the funds outside of Unity House's account, outside of the scope of Unity House's authorization, and within their own control.

*Id.* at 1544-45.

So here. Transfers out of the Evans IOTA and 160 Royal Palm Account were not the "spending" of fraud proceeds any more than the transfers out of the Unity House account at Credit Suisse to defendants' account in *Rude* were. Just as in *Rude,* R. Matthews overlooks the fact that the fraud could not have been complete until EB-5 money deposited in those accounts was outside of the scope of the EB-5 investors' authorization and within his complete control. The victim in *Rude* was promised that the money would stay in the Credit Suisse account so when it was transferred out of that account, a diversion had occurred. Here, the EB-5 investors were falsely promised that their money (whether in the Evans' IOTA Account or the 160 Royal

Palm Account) would be used to in connection with the Palm House Hotel.   Once money was transferred out of those accounts and used for some other purpose, the money had left the scope of the investors' authorization.   Thus, those transfers were in furtherance of the scheme to defraud because they allowed defendants to divert EB-5 funds for their own benefit.   *See also United States v. Sindona*, 636 F.2d 792 (2d Cir. 1980) (finding "[a] scheme to defraud is not complete until the proceeds have been received and use of the mail or wires to obtain the proceeds satisfies the jurisdictional element;" affirming wire fraud conviction where defendant charged with subsequent transfer of illegal trading profits to co-defendant's personal account from an account defendant controlled).   *Compare United States v. Redcorn*, 528 F.3d 727, 739 (10th Cir. 2008) (wire transfers of previously embezzled funds from defendants' personal bank accounts to their personal investment accounts not "in furtherance" because "[t]he scheme . . . had reached fruition.   The persons intended to receive the money had received it irrevocably.") (citation omitted); *United States v. Maze*, 414 U.S. 395, 648 (1974) (vendors' mailing of invoices to bank that issued credit card stolen by defendant not in furtherance because defendant had already received benefits of food and lodging charged on the stolen card irrevocably).

Given that the money transfers charged in the Indictment were not simply "spending" of fraud proceeds, it is little wonder that the bank fraud cases R. Matthews cites which turn on when the bank is placed at risk of financial loss are inapposite.   *See United States v. Kilkenny*, 493 F.3d 122, 129-30 (2d Cir. 2007) (finding defendant's failure to repay previously obtained bank loan not part of bank fraud offense because bank put at risk of financial loss as soon as defendant obtained funds); *United States v. Anderson*, 188 F.3d 886, 892 (7th Cir. 1999)

(defendant's later transfer of money out of account into which bank fraud proceeds were deposited and into a second account not "in furtherance").

Because transfers of EB-5 money out of the 160 Royal Palm Account and the Evans' IOTA Account were necessary to place the funds out of the scope of the EB-5 investors' authorization and under R. Matthews' irrevocable control, such transfers were made in furtherance of the over overall scheme to defraud.

> ### 3. Counts Seven and Eight Furthered R. Matthews' Attempt to Prolong the Scheme by Installing Evans as the Managing Member of the Palm House Hotel.

Counts Seven and Eight charge emails to and from G. Matthews' email account in Connecticut that were part of an effort to maintain defendants' control of the Palm House Hotel. Specifically, Count Seven charges an email from R. Matthews' employee to G. Matthews' email account in Connecticut attaching a letter firing the minority owner of the hotel from his position as manager. *See* Gov't Exh. F. Count Eight charges an email from G. Matthews' email account in Connecticut to Evans appointing Evans as the managing member instead. *See* Gov't Exh. G. R. Matthews argues that the emails charged in Counts Seven and Eight were not made in furtherance because R. Matthews had stopped obtaining money from EB-5 investors or SARC by that time and the alleged scheme to obtain EB-5 funds had concluded before the dispute over control. R. Matthews' Mot. at 8. He is wrong.

In October 2014, control of the Palm House Hotel was a critical factor in the continued success of the scheme to defraud. Without control of the hotel, R. Matthews could make no claim to any additional money from EB-5 investors or other investors. Although R. Matthews makes much of the fact that, by this time, *he* had ceased obtaining money from the EB-5

investors or from SARC, he misses the point. EB-5 money earmarked for the development of the Palm House Hotel continued to flow into SARC throughout this time period, and certainly, R. Matthews wanted to continue to get a piece of that money. *See, e.g.,* Gov't Ex. C (Invoice dated 10/31/14 documenting $500,000 investment in the Palm House Hotel wired to SARC).

Ousting the minority member as manager was critical in this endeavor because that member had started to question R. Matthews' use of EB-5 funds and tried to assert control over the hotel. The email charged in Count Seven arose out of this struggle for control as it transmitted a letter to G. Matthews purporting to fire the minority member. *See* Gov't Exh. F (letter dated October 20, 2014 from G. Matthews to R.B. stating: "You are hereby notified that you have been removed as Manager of Palm House, LLC (the "Company") effective as of the date of this letter.") What immediately followed was an email, charged in Count Eight, from G. Matthews to defendant Evans appointing Evans as the new Manager of the Palm House Hotel. *See* Gov't Exh. G ("Les, this email will confirm that I Gerry Matthews have appointed you Les Evans as the Managing Member of Palm House LLC.").

Transmissions after money has been deposited in a scheme to defraud may still further the fraud if they aim to prolong the scheme itself. For example, in *Slevin*, the defendant sold performance bonds to construction contractors through a sham company that lacked sufficient resources to pay on the bonds if a contractor defaulted. 106 F.3d at 1088. Contractors paid premiums to the defendant for the bonds and used those bonds to secure construction contracts with third parties. *Id.* Those third parties later reimbursed the contractors for the earlier premium payments contractors made to the defendant. *Id.* Defendant was charged with mail fraud for the third parties' mailings of reimbursement checks to contractors who had paid

premiums to defendant's shell companies. Defendant challenged his conviction on the grounds that these mailings occurred after he had already received payment for the bonds from the contractors and therefore could not have been "in furtherance" of the fraud. *Id.* at 1089.

In rejecting defendant's argument and affirming his conviction, the Second Circuit relied on *Schmuck*, 489 U.S. at 711-12 to find that "the fraudulent venture was not an isolated swindle but rather was an ongoing operation in which [defendant] sought to provide contractors . . . with bonds for all of their construction jobs. . . . As [defendant] envisioned his scheme . . . it was in his interest that any contractor who paid him a premium be reimbursed by the [third party] for that premium; otherwise, the contractor would not continue to obtain its bonding from [defendant]." *Id.* at 1091. In other words, the mailings of reimbursement checks by third parties was in furtherance of defendant's scheme to defraud because defendant perceived those mailings as "helping to keep the scheme in operation." *Id.*

Similarly, in *Schmuck*, defendant was a used car wholesaler who fraudulently rolled back odometers on cars he sold to retailers. 489 U.S. at 711-12. After the retailers in turn sold the cars, they mailed title application forms for the cars to the State. *Id.* These mailings, which occurred long after the retailers had already paid defendant for the cars, formed the basis for defendant's mail fraud conviction. *Id.*

The Supreme Court affirmed defendant's conviction and rejected defendant's argument that the title application mailings were not in furtherance of the fraud. *Id.* at 711. The Court noted that Schmuck's fraudulent scheme "was not a 'one-shot' operation in which he sold a single car to an isolated dealer," but was instead an "ongoing," "large-scale operation," in which he dealt with some retailers for years. *Id.* The success of Schmuck's scheme depended on the

continued smooth flow of cars from the dealers to their customers.   Although he had already
profited from the sale of the altered vehicles by the time the mailings occurred, the mailings were
essential to prolonging Schmuck's scheme and were therefore "in furtherance" of it.   *Id.*

Here, the scheme to defraud relied on continuing access to EB-5 money earmarked for
development of the Palm House Hotel.   Defendants' control of the hotel enabled potential
access to EB-5 money or at least other investors' moneys.   Without such control, defendants had
no access to any cash flow.   Defendants' attempts to remove a minority member who sought to
freeze them out and install defendant Evans was certainly in furtherance of their fraud as those
attempts sought to maintain control of the hotel and access to the money available for diversion.
Defendants' motions to dismiss Counts Seven and Eight should be denied.

For the foregoing reasons, R. Matthews' motions to dismiss should be denied.   To the extent that
M. Matthews and Evans joined in the R. Matthews' motions to dismiss, their motions should be denied as
well.

## III.   Motions to Transfer Venue

R. Matthews also moves, in the alternative, that this case be transferred on convenience
grounds to the Southern District of Florida under Fed. R. Cr. P. 21(b).   This motion should be
denied because litigating and trying this case in the Southern District of Florida would be less
convenient and more costly than allowing this case to proceed here in Connecticut.

### a.   Governing Law

Article III of the United States Constitution provides that "[t]he trial of all
crimes . . . shall be held in the state where the said crimes shall have been committed." U.S.
Const. Art. II, sec. 2.   Further, the Sixth Amendment states that in all criminal prosecutions, the
accused shall be tried "by an impartial jury of the State and district where the crime shall have

been committed."

Continuing offenses (which include the use of the mails or transportation in interstate commerce) may be prosecuted "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). Where an otherwise proper venue would be inconvenient or burdensome, a defendant may move to transfer to another under Fed. R. Crim. P. 21(b). The burden is on the *defendant* to show that a transfer is justified. *United States v. Wilson*, 2001 WL 798018, at *1 (S.D.N.Y. 2001); *United States v. Posner*, 549 F. Supp. 475, 477 (S.D.N.Y. 1982).

Fed. R. Crim. P. 21(b) provides:

> Transfer for Trial . . .
>
> (b)     For Convenience. Upon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice.

The decision to transfer venue rests with the "sound discretion of the trial court." *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990). "But mere inconvenience, interference with one's routine occupational and personal activities, and other incidental burdens which normally follow when one is called upon to resist a serious charge do not *ipso facto* make the necessary showing that a transfer is required in the interest of justice." *United States v. U.S. Steel Corp.*, 233 F. Supp. 154, 157 (S.D.N.Y. 1964). Further, as a general rule a criminal prosecution should be retained in the original district. *Id.* To warrant a transfer where an indictment was properly returned "it should appear that a trial there would be so unduly burdensome that fairness requires the transfer to another district." *Id.*; *see also United States v. Wilson*, 2001 WL 798018, at *1 (S.D.N.Y. 2001); *United States v. Posner*, 549 F. Supp. 475, 477b (S.D.N.Y. 1982).

In deciding such a motion, the court should consider factors such as: (1) location of the defendants; (2) location of possible witnesses; (3) location of events likely to be at issue; (4) location of relevant documents and records; (5) potential for disruption of the defendants' businesses if transfer is denied; (6) expenses to be incurred by the parties if transfer is denied; (7) location of defense counsel; (8) relative accessibility of the place of trial; (9) docket conditions of each potential district; and (10) any other special circumstance that might bear on the desirability of a transfer.  *Platt v. Minnesota Mining & Manufacturing Co.*, 376 U.S. 240, 243-44 (1964).

> **b.  Consideration of the *Platt* Factors Weighs in Favor of Denying a Transfer to the Southern District of Florida.**

> **1.  Location of Defendants.**

R. Matthews currently resides in the Southern District of Florida as do his co-defendants M. Matthews, and Evans.   He argues that this factor should be given greater weight than any other.   R. Matthews cites a purported "policy" by "district courts in the Second Circuit" that "courts should, whenever possible, try defendants where they reside."   R. Matthews Mot. at 11. To the extent such a policy exists, it is not "in the Second Circuit," but rather, in the Southern District of New York, where all three of the cases R. Matthews cites arise.   Further, for whatever such a "policy" is worth, all three cases R. Matthews cites acknowledge that any such policy "is in tension with the more general presumption that 'a criminal prosecution should be retained in the original district,'" and only one (an unpublished decision) granted a transfer.

In that case, six of seven individual defendants charged with running an illegal money transmitting business lived in Florida and two corporations operated out of Florida.   *United States v. Valdes*, 2006 WL 738403, at *4 (S.D.N.Y. 2006).   One of the defendants lived in

Miami with his wife and twin infants, another was responsible for three family members (a stepsister, her five-year old child, and his 60 year old mother), another was a single mother who received no child-support, and another lived in Miami and was responsible for four children ages 10 through 19.  *Id.*

The family obligations of multiple defendants in *Valdes* are not comparable here and R. Matthews offers no facts even attempting to make it so.   R. Matthews asserts – without any supporting evidence – that he has "no source of income" and "barely any money to pay for food and gas" to establish that traveling to Connecticut would be unduly burdensome.   R. Matthews' Mot. at 12.   Despite this claimed poverty, R. Matthews continues to live at his 16,000 square foot beachfront estate in Palm Beach.   Gov't Exh. J.   Further, R. Matthews has been able to access funds with which to retain private counsel in this case.   Finally, in his bankruptcy proceeding, R. Matthews disclosed in a filing dated October 22, 2018 that he received "Salary of Cash from Business" in the amount of $18,339 in September 2018.   Gov't Exh. K at 3.   He also lists utility expenses of $3,853.25 and "Travel & Entertainment" expenses of $849.57 for the month of September 2018 in a bankruptcy filing dated October 22, 2018.   *See id.*

Given that R. Matthews' claims of burden are entirely unsupported and appear to be rebutted by readily observable facts, to the extent this factor weighs in favor of transfer, it does so barely.   The defendants' desire to be tried where they currently reside, must be balanced by the filing of this properly venued case in Connecticut where both of the Matthews lived for much of the charged scheme to defraud and where millions of dollars of diverted EB-5 funds were directed.   The defendants directed their fraud towards maintaining their then-Connecticut residence, directed millions in fraudulent proceeds towards Connecticut banks and emailed back

and forth with a full-time Connecticut confederate in order to execute the scheme. That they would be required to return here for trial after choosing to leave the District does not seem unduly inconvenient on these facts.

### 2. Location of Witnesses.

R. Matthews argues that the location of possible witnesses weights "heavily" in favor of transfer citing a "no contact" list provided by the government at the defendants' initial appearance and offering conjecture about where those witnesses may reside. Matthews' Mot. at 12. Matthews offers no specificity, claiming that "[b]ased on information and belief, less than a dozen of these people reside in Connecticut, and, aside from the foreign EB-5 investors, the vast majority appear to be located in the Southern District of Florida." *Id.* This admitted speculation falls far short of meeting defendant's burden.

A "naked allegation that witnesses will be inconvenienced by a trial in a distant forum will not suffice for transfer." *United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 456 (S.D.N.Y. 1997). Instead, "[d]efendants must offer specific examples of witnesses' testimony and their inability to testify because of the location of the trial" and "the court must rely on 'concrete demonstrations' of the proposed testimony." *Id.* Matthews offers none of this. He fails to identify a single witness he might call on his behalf, let alone provide a proffer of witness testimony or why his witnesses would be unable to testify given a trial in Connecticut. All that Matthews offers is speculation about individuals on the government's "no contact" list without offering any specificity by name or anticipated testimony or any information about the burden (or lack thereof) to any of these individuals. Indeed, to the extent the government would be calling a witness to testify, their travel, lodging and per diem expenses would be borne by the

24

government resulting in no out-of-pocket costs to them.

For its part, the Government would call at trial several witnesses with significant ties to Connecticut. For instance, Gerry Matthews resides in Middlebury, Connecticut and is R. Matthews' brother.   G. Matthews would provide important testimony as to the wire fraud scheme, the bank fraud scheme and his direct involvement in six of the eight charged wire transmissions (Counts One, Three, Five, Six, Seven, and Eight).

As to both the bank and wire fraud scheme, G. Matthews would testify that, he and R. Matthews spoke about the foreclosure of the property at 115 Lower Church Hill Road, and that R. Matthews planned on getting the property back.   In connection with those discussions – and as charged in Count One – he received an email from R. Matthews' email account on or about February 1, 2014 forwarding login instructions to bid on the property at 115 Lower Church Hill Road.   He will also provide an eye-witness account of the fact that R. Matthews lived in the property and acted as its owner both before and after the foreclosure sale.

As to the wire fraud scheme, G. Matthews would testify that he runs Matthews Commercial Properties, a commercial real estate brokerage company in the Waterbury area, and maintained a savings account in MCP's name at Webster Bank, a local Connecticut bank.   As alleged in the Superseding Indictment, Counts Three, Five and Six all charge R. Matthews and Evans with diverting money out of the MCP Savings account by way of wire or check.   G. Matthews would testify, among other things, that R. Matthews asked to use this bank account to hide money from creditors and that R. Matthews would direct G. Matthews to wire money out or to transfer funds into other bank accounts and then write a check for R. Matthews' benefit.

G. Matthews would also testify that in or around October 2014, he was informed that he

was listed as the 99% owner of the Palm House Hotel by Joseph Walsh and the managing member of the Palm House Hotel (the listed 1% owner of the Palm House Hotel) and that R. Matthews had been stealing money from the project. G. Matthews would testify that he assisted in helping R. Matthews maintain control of the Palm House Hotel and its money by approving a letter sent on October 20, 2014 relieving the minority member of his position as manager of the Palm House Hotel (as charged in Count Seven), and by sending an email on or about October 21, 2014, appointing Evans as managing member instead (as charged in Count Eight).

Laudano is another important witness in this case who the government intends to call at trial. Laudano was a resident of both Connecticut and Florida at the time of the events alleged in the Superseding Indictment and now lives in Florida full-time. Laudano was a central participant in the scheme to defraud JPMC, which had foreclosed on R. Matthews' home at 115 Lower Church Hill Road. Laudano would testify that he agreed to act as a straw purchaser of the property out of foreclosure and concealed the fact that R. Matthews was behind the purchase. Laudano would testify about the documents executed in order to further this fraudulent scheme, including a letter Evans sent to the Auction.com website falsely representing that Laudano had provided $2,750,000 to Evans for the purchase of 115 Lower Church Hill Road, Gov't Exh. I, and an email he received on or about April 29, 2014 (as charged in Count Four). Laudano also served as the general contractor of the Palm House Hotel and would be able to provide detail into the operations of that project.

R. Matthews' former assistant, Jade Yu ("Yu"), who now lives in Chicago would also be an important witness for the government. She would testify extensively about the bank fraud and how R. Matthews directed her to establish an account at auction.com and instructed her and

Laudano to bid on the property.   She would also testify about the establishment of the straw company, NJL Development, LLC that was ultimately used to purchase the property.  *See generally* Tr. of Jennifer Jade Yu (October 25, 2016), Gov't Exh. L, at 114, 126–138 (Yu's SEC testimony regarding the purchase of 115 Lower Church Hill Road).   As R. Matthews' assistant, she would also provide extensive testimony about how the Palm House Hotel worked.

These three important government witnesses do not weigh in favor of either forum as one resides in Florida, one in Connecticut, and one in Illinois. Balanced against defendants' failure to specify anything about where their witnesses might be located, what they might testify to at trial, or how they would be inconvenienced, this factor appears neutral.

### 3.   Location of Events at Issue.

R. Matthews claims that the connections between the wire fraud scheme and Connecticut are "tenuous, if not nonexistent," R. Matthews' Motion at 13, but this simply disregards what the Indictment actually says.   In fact, every single one of the wires charged in the Superseding Indictment is Connecticut-based: Counts 1 and 7 (emails to Connecticut); counts 2 and 3 (wires to Connecticut); Counts 4 and 8 (emails from Connecticut); and Counts 5 and 6 (checks causing money transfers to Connecticut.  *See* Doc. No. 39 at ¶ 25.

Beyond that, the scheme itself ties closely to Connecticut as it involved a diversion of EB-5 money to G. Matthews' Connecticut bank account; the purchase of the 115 Lower Church Hill Road property in Connecticut (*id.* at ¶ 22); and the purchase of 105 Lower Church Hill Road, another property in Connecticut (*id.* ¶ 23).   Further, what R. Matthews leaves out of all of this is that he actually resided in Connecticut at the 115 Lower Church Hill Road property for much of the events at issue in the Superseding Indictment.   *See* Gov't Exh. H (R. Matthews

letter in which he states he had "recently decided to spend several months a year in the home, and enroll our two young daughters in the local school").

The entire focus of the bank fraud counts (Counts Nine and Ten) was the 115 Lower Church Hill Road property so it is hard to see how those counts – or any of the attendant transactions, emails and document signings that were required in Connecticut for the property closure – could weigh more towards any other forum.

R. Matthews concedes that Counts Eleven through Twenty weigh in favor of Connecticut since these charges involve the defendants' illegal monetary transactions through Connecticut banks. In an effort to minimize the impact of this simple fact (unfavorable to his argument), R. Matthews asserts that proof of these counts would involve "at most a few additional bank records," implying that the Connecticut nexus is simply not very important. R. Matthews' Mot. at 14.   Whether R. Matthews believes the government's required evidence on these counts is a lot or a little, is beside the point.   Whatever the volume of evidence, these counts involve illegal monetary transactions using Connecticut banks, and this Connecticut forum has an obvious interest in trying those charges.

Finally, as to Count Twenty-One, R. Matthews throws out that "much of the evidence relating to the tax evasion allegation is duplicative of the evidence relating to all of the other counts," and therefore, that Count 21 should go along for the ride down to Florida.   R. Matthews' Mot. at 14.   However, R. Matthews has failed to show that the events at issue in the other 20 counts weigh in favor of anywhere but Connecticut, so Count 21 should not be going anywhere.   Because five of the eight affirmative acts of evasion alleged in the Indictment relate to Connecticut, the Matthews' longstanding evasion of payment weights in favor of this

Connecticut forum.

### 4. Location of Documents and Records.

The documentary evidence in this case is voluminous and has been consolidated in Connecticut.   However, given the reality of electronic document storage and modern transportation and shipping capabilities, this factor is neutral.

### 5. Disruption of Defendants' Business.

The only argument R. Matthews makes here is that trial in Connecticut would disrupt defendant Evans' law practice in Florida because it would force Evans to be away for trial preparation and trial.   R. Matthews' Mot. at 15.   What the defendants fail to explain however, is how that hardship would be substantially lessened with a trial in Florida. Trial and preparation for trial is inconvenient regardless of location and whether the trial occurs in Florida or Connecticut, Evans would be unavailable for legal work or client development during that period of time. That is precisely why courts have recognized that "inconvenience and interference with normal occupational and personal activities occur whenever a defendant is involved in a trial facing serious charges." *Spy Factory*, 951 F. Supp. at 458 (*citing* U.*S. Steel Corp.*, 233 F. Supp. at 157).

Further, the website for Evans' practice lists five other lawyers – the most junior of whom has 12 years of experience and the most senior with 43 years of experience.   *See* Gov't Exh. M. (listing attorneys having graduated law school in 1975 (43 years' experience); 1986 (32 years' experience); 1989 (29 years' experience); 2002 (16 years' experience); and 2006 (12 years' experience)).   To the extent Evans absence might impact his firm, there are other attorneys who could pick up the slack.

Finally, it appears entirely possible that defendant Evans' law practice may already be disrupted as R. Matthews' motion refers to Evans possibly having to move to new office space. R. Matthews' Mot. at 15. However, that disruption has nothing to do with where the case is tried, and everything to do with clients not wanting to retain a law firm whose name partner is accused of having engaged in a wide-ranging scheme to defraud and misusing his IOTA account in order to do so.

### 6. Expense to the Parties.

R. Matthews claims that he has "barely any money to pay for food and gas, no less airfare to travel to Connecticut and all of the hotel and car rental expenses associated with trial." As set forth above, there is reason to be skeptical of this hardship claim R. Matthews has obtained funds to retain his private legal team, shows an $18,000 influx of cash in September 2018, and continues to live in his 16,000 square foot ocean-front estate. To the extent the purchase of roundtrip airfare is truly a financial hardship, 18 U.S.C. § 4285 allows the court, in the interests of justice and after appropriate inquiry establishing financial need, to order the U.S. Marshals Service to arrange for the defendant's noncustodial transportation or furnish the fare for such transportation to the place where appearance is required, and, in addition, may direct the U.S. Marshals Service to furnish an amount of money for subsistence expenses not to exceed the federal per diem authorization.

Balanced against defendant's cost of transportation (potentially covered if the claimed hardship is established), is the substantial cost to the government in moving this case to Florida. Although R. Matthews insists that any expenses to the government of transferring this case to Florida "would be limited," he simply disregards any burden to the government. R. Matthews'

Mot. at 15. To be sure, the government would cover the expenses required to try this case regardless of location, but that doesn't mean those expenses are not a burden to be considered. If this case were transferred, the Government would have to relocate personnel who investigated the case – including (at a minimum) two Assistant U.S. Attorneys, two case agents (FBI and IRS), and a financial analyst – to Florida.

### 7. Location of Defense Counsel.

All three teams of defense lawyers are located in Connecticut so if this case were transferred to Florida, those legal teams would incur flight and car rental expenses, hotel expenses, and meal expenses that would not otherwise be incurred in their home state of Connecticut. Five lawyers have made appearances on behalf of the three charged defendants in this case and certainly transporting and housing those defense lawyers, along with two government lawyers, two government agents (and any other necessary support employees) would far outweigh the costs associated with having three defendants travel from Florida to Connecticut for trial.

### 8. Relative Accessibility of Place of Trial.

R. Matthews argues that the relative accessibility of the Southern District of Florida favors that venue because the federal courthouse in Florida is purportedly closer to the nearest airport. R. Matthews' Mot. at 16. However, R. Matthews fails to demonstrate any problems with accessibility to the federal courthouse in Bridgeport which would justify a transfer, and as such, this factor does not weigh in favor of either forum. *See Spy Factory, Inc.*, 951 F. Supp. at 460.

### 9. Docket Conditions of Each District.

R. Matthews claims that he "is not aware of any difference between in [sic] docket condition between the two districts" and that this factor therefore does not weigh in favor of either forum. However, publicly available statistics for the United States Courts (available at www.uscourts.gov/statistics-reports) strongly suggest that docket conditions for these two forums are significantly different. Table D of the U.S. District Courts Criminal Statistical Tables for the Federal Judiciary (June 30, 2018) totals the number of criminal filings, terminations and pending cases as of June 30, 2018. Looking at the number of pending cases in Connecticut versus the Southern District of Florida shows that Connecticut had 642 pending criminal cases while S.D. Florida had 1,955. Gov't Exh. N at 1, 3. The website for the District of Connecticut lists 14 district court judges and 8 magistrate judges, for a total of 22. Gov't Exh. W. The website for the S.D. of Florida lists 23 district court judges and 16 magistrate judges, for a total of 39. Gov't Ex. Gov't Exh. V. That would mean that as a rough measure of business, judges in the District of Connecticut have approximately 29.2 criminal matters while those in the S.D. of Florida have approximately 50.1. While there are certainly different ways that one can look at statistics, Florida appears to have a busier docket than Connecticut, and this factor therefore weighs against transfer.

### 10. Other Special Circumstances.

The Government is not aware of other special circumstances that weigh in favor of either forum.

### c. Consideration of the *Platt* Factors Weighs in Favor of Denying a Transfer to the Southern District of Florida.

Defendants have not shown that the interests of justice require a transfer of this case. Although the location of the defendants in Florida weighs in favor of that forum, it does so only slightly. R. Matthews claims he would be financially unable to bear the costs of appearing and preparing for trial in Connecticut and yet continues to live in a 16,000 square foot multi-million dollar property, secures money to pay for retained counsel in this case, and discloses over $18,000 in income in September 2018 alone to the bankruptcy court.

The other factor that might potentially weigh in favor of a transfer –disruption to Evans' business – is also nearly neutral since the defendants provide no specific information about how a trial in Connecticut would be any more disruptive to Evans' six-lawyer firm than a trial in Florida.   Moreover, because the law firm already appears to be suffering disruption ("the Indictment also might result in the law practice having to move to new office space"), there is every reason to believe that Evans' charged role in the Indictment and not the trial location is what is causing the disruption.

The location of witnesses, location of documents and records, and relative accessibility appear to be neutral factors that do not significantly weigh in favor of one forum over another.

The location of events at issue, expense to the parties, location of counsel and docket conditions of the respective forums all weigh in favor of Connecticut. The fraud-related counts (Counts One through Ten) and the tax count are all intertwined with events that occurred or property located within Connecticut.   Counts Eleven through Twenty seek to enforce the District of Connecticut's interest in prosecuting illegal monetary transactions involving Connecticut banks.   A trial in Florida would be more expensive than a trial in Connecticut for

all parties because all three defendants have retained Connecticut counsel who would have to travel if this case were transferred.   The Government too would incur travel expenses for its investigative team.   The district court in the Southern District of Florida appears more congested than the federal court here in Connecticut, also weighing against a transfer.

Defendants have failed to show that a trial in Connecticut would be unduly more burdensome than a trial in Florida.   Although this criminal trial will undoubtedly interfere with defendants' routine personal activities, that will be true no matter where this trial occurs.   Their mere desire to have the case tried in Florida falls far short of what is required to justify a convenience transfer to Florida.

Accordingly, R. Matthews' Motion should be denied in its entirety.   To the extent that M. Matthews and Evans join in his motion, their motions should be denied as well for the same reasons.

## IV.  Motion to Sever

Finally, Evans asks that this Court sever his trial from that of his codefendants.   In support of his requests, he makes two arguments.   First, he claims that he needs R. Matthews to testify at trial because R. Matthews will provide exculpatory evidence regarding Evans. Second, he claims that a joint trial would violate his Sixth Amendment right to confront witnesses against him if the Government introduces R. Matthews' testimony before the Securities and Exchange Commission ("SEC") at trial.   Neither argument has merit.

### a.  Governing Law

"There is a preference in the federal system for joint trials of defendants who are indicted together."   *Zafiro v. United States*, 506 U.S. 534, 537 (1993).   That preference is

"particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998). The preference for joint trials is based on a number of considerations. The Supreme Court has explained that:

> Joint trials play a vital role in the criminal justice system . . . . It would impair both the efficiency and fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

*Richardson v. Marsh*, 481 U.S. 200, 210 (1987).

In light of these well-established considerations, "when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 *only if* there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539 (emphasis added).[5] "A defendant seeking severance must show that the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials." *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998). Even then, "Rule 14 does not require severance even if prejudice is shown." *Zafiro*, 506 U.S. at

---

[5] Rule 8(b) of the Federal Rules of Criminal Procedure states, in relevant part, that an indictment "may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Rule 14(a) provides: "If the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."

538-39.

Defendants are not entitled to severance merely because they may have a more favorable outcome in separate trials. *Id.* at 540; *see also United States v. Toner*, 728 F.2d 115, 129 (2d Cir. 1984) ("It is immaterial whether the defendant would have had a better chance of acquittal."). Nor is severance warranted simply because the evidence against a co-defendant is more damaging than the evidence against the defendant. *See, e.g.*, *United States v. Cardascia*, 951 F.2d 474, 483 (2d Cir. 1991); *United States v. Chang An-Lo*, 851 F.2d 547, 556 (2d Cir. 1988); *United States v. Ciambrone*, 787 F.2d 799, 811 (2d Cir. 1986). "[E]ven when the risk of prejudice is high, measures less drastic than severance, such as limiting instructions, often will suffice to cure any risk of prejudice." *United States v. Diaz*, 176 F.3d 52, 104 (2d Cir. 1999) (quotation marks and citations omitted).

In sum, "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993).

### b. Evans' Alleged Misconduct

Evans' trial should not be severed. He was properly joined under Federal Rule of Criminal Procedure 8(b) because he and his codefendants – in particular R. Matthews – engaged in "the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b).

Evans has a long history with R. Matthews. He has served periodically as R. Matthews' real estate attorney since 2004. *See* Tr. of Testimony of Leslie R. Evans (Jan. 26, 2017), Gov't Exh. O ("Evans SEC Tr.") at 21–22. Occasionally he helped R. Matthews or M. Matthews establish various legal entities. *Id.* at 31. With respect to the Palm House Hotel, he helped with

36

the title work when R. Matthews reacquired the hotel in August 2013 and occasionally provided R. Matthews with legal advice. *See id.* at 32.

Evans had an instrumental role in the commission of the offenses charged in the indictment. With respect to the wire fraud, Evans was responsible for distributing funds earmarked for development of the Palm House Hotel from his IOTA account. *Id.* at 37. He understood that the funds in that account were primarily for the redevelopment of the Palm House Hotel. *Id.* (Q. What was your understanding of what the funds were for? What was the intended use of those funds? A. My understanding was, it was for a wide range of uses, but primarily for the – for the re-development of the Palm House Hotel."). Indeed, he was aware that the funds had been provided by EB-5 investors for the Palm House Hotel as early as August 2013. *See* Gov't Exh. P (signed letter from Evans establishing that "[t]he first $500,000 of EB-5 money was disbursed from my firm's Escrow Account on August 15, 2013, for the purchase of the Palm House."). That notwithstanding, Evans authorized the release of millions of dollars from his IOTA account for projects entirely unrelated to the Palm House Hotel. *See* Gov't Exh. Q (Quickbook records from Evans regarding funds related to the Palm House with handwritten annotations made by Evans); Evans SEC Tr. at 76 (Evans acknowledging his handwriting on the document). For instance, he authorized the release of money to pay R. Matthews' legal fees, home taxes, and mortgage payments. *See* Gov't Exh. Q (Evans' handwriting noting "RVM Home Taxes," RVM Mtg" among others). Evans admitted as much during his SEC testimony, *see, e.g.*, Evans SEC Tr. at 85–86, and he received contemporaneous emails instructing him to release the funds for those purposes. *See, e.g.*, Gov't Exhs. R, S.

Evans also played a significant role in the commission of the bank fraud. As described

more fully above, the indictment alleges that Evans, R. Matthews, and Laudano fraudulently concealed and misrepresented the nature of the relationship between the shell company purchasing the home out of foreclosure, NJL Development, LLC and R. Matthews. Evans furthered this scheme by *affirmatively* misrepresenting to the agent of the bank, JPMC, that Nick Laudano and NJL Development, LLC had sent him money that he was authorized to use to purchase the property out of foreclosure and making it appear as though Evans represented NJL Development and Nicholas Laudano. *See* Gov't Exh. I (letter from Evans to auctioneer handling the foreclosure sale of 115 Lower Church Hill Road stating "[t]his email shall confirm that our firm is in receipt of cleared funds in the amount of $2,750,000.00 from Nick Laudano/NJL Development Group, LLC. As part of said transaction, we will be wiring the amount of $136,237.50 to [the attorney for the bank] today."). In fact, and as Evans knew and subsequently acknowledged to the SEC, Evans never represented Laudano or NJL Development, LLC and at no point did he receive money from Laudano or NJL Development, LLC, let alone for the purpose of purchasing the property at 115 Lower Church Hill Road. Evans SEC Tr. at 51–52 ("Q. Did you ever serve as legal counsel to Nick or any of the entities that he owned or controlled? A. No. Q. Did you ever receive any funds from Nick or any of the entities that he owned or controlled? A. I don't believe I did.").

In fact, this was not the only time that Evans misled or tried to mislead a bank. He had done so nearly a year prior in June 2013 in an attempt to buy the same property from JPMC, but this time for the benefit of an individual named John Marcus Payne rather than Nicholas Laudano. *See* Gov't Exh. T (letter in which Evans claims that Payne is his client and that he is holding $1.35 million dollars in his account for the purchase of the property at 115 Lower

Church Hill Road).   In fact, at no point did Payne provide $1.35 million dollars to Evans for the purchase of 115 Lower Church Hill Road.   In April 2014, Evans again made a misrepresentation to a bank – this time Webster Bank – regarding Laudano.   He claimed that his firm was holding $475,000 in funds from Nicholas Laudano and his mother Joanne.   *See* Exhibit U at 103–04. He was not.[6]

### c. Argument

It is against this backdrop that Evans argues his case should be severed from his two co-defendants.   He first claims that severance is warranted because R. Matthews provided exculpatory testimony regarding Evans to the SEC, and Evans wants R. Matthews to provide that testimony again during Evans' criminal trial.   Evans, however, anticipates R. Matthews asserting his Fifth Amendment right against self-incrimination if called during their joint trial. Evans points to *United States v. Finkelstein*, 526 F.2d 517 (2d Cir. 1975) as justifying severance in these circumstances.   Second, Evans claims that severance is warranted because R. Matthews' SEC testimony, if introduced at trial, would violate his Sixth Amendment right to confrontation because Evans did not have the opportunity to cross examine R. Matthews during his SEC testimony.   Both arguments are without merit.

### i. *United States v. Finkelstein* **Does Not Warrant Severance Here.**

The Second Circuit recognized in *Finkelstein* that the availability of exculpatory testimony of a co-defendant might form the basis for severance under Rule 14(a).   *See* 526 F.2d

---

[6] At this time, the Government intends to introduce details regarding this transaction as well as the earlier attempted transaction involving Payne as either direct evidence of the conspiracy or as 404(b) evidence.

at 523–24.   As a threshold matter, however, the proposed testimony has to be exculpatory.   *See, e.g.*, *United States v. Triumph Capital Grp., Inc.*, 260 F. Supp. 2d 432, 442 (D. Conn. 2002) (denying severance motion under *Finkelstein*, in part, because "[defendant] has not made a sufficient showing that [co-defendant's] testimony would be exculpatory"); *United States v. Freedman*, 317 Fed. App'x 22, 25–26 (2d Cir. 2008) (affirming decision not to sever trial, in part, because the testimony co-defendant would have provided "did not promise substantially exculpatory testimony").   Assuming it is exculpatory, there are four factors that generally should be considered in determining whether to grant severance:

> (1) The sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege;
>
> (2) The degree to which the exculpatory testimony would be cumulative;
>
> (3) The counter arguments of judicial economy; and
>
> (4) The likelihood that the testimony would be subject to substantial damaging impeachment.

*Id.*; *see also United States v. Ferguson*, 676 F.3d 260, 287 (2d Cir. 2011).   The defendant seeking severance carries the burden of demonstrating that these factors weigh in favor of severance.   *See Triumph*, F. Supp. 2d at 442.   Evans has failed to do so here.

### 1.  Evans Has Not Demonstrated that R. Mathews Would Provide Exculpatory Testimony.

As a threshold matter, Evans has not demonstrated that the evidence R. Matthews would provide if called to testify at trial would be exculpatory.   *See, e.g.*, *Triumph*, 260 F. Supp. 2d at 442 (denying severance motion under *Finkelstein*, in part, because "[defendant] has not made a sufficient showing that [co-defendant's] testimony would be exculpatory"); *Freedman*, 317 Fed. App'x at 25–26 (affirming decision not to sever trial, in part, because defendant had not

40

established that his co-defendant would provide "substantially exculpatory testimony").

In the Severance Motion, Evans claims that Matthews' testimony tends to show that he acted in good faith because he believed his actions were lawful.   Severance Mot. at 6.   He points to three areas of Matthews' SEC testimony in support of this proposition and claims that this testimony demonstrates that he acted at the direction of R. Matthews and others and "not of his own volition or knowledge."   *Id.* at 5.   That is not so.

The three citations Evans provides tend to demonstrate that he acted at the direction of Matthews or others – but it says nothing about his knowledge with respect to the fraudulent scheme.   *See* Matthews Vol. I SEC Tr. at 132 (cited by Evans) ("Q. Do you know whether Jade ever conducted any business out of 160 Royal Palm's Bank account or Les – or directed Les Evans to do anything absent authorization from you? A. Yes."); Tr. of Robert Viers Matthews (Feb. 13, 2017), Gov't Exh. X ("Matthews Vol. II SEC Tr.") at 565 (cited by Evans) (explaining that R. Matthews or Jade Yu had Evans execute agreements and powers of attorney); *id.* at 706 (cited by Evans) ("Q. Did you or Jade direct Les Evans to transfer those funds? A. Yes.").   More specifically, nothing in R. Matthews' SEC testimony establishes exactly what Evans knew about the documents he signed one way or another.   In fact, nothing refutes the fact that Evans, by his own admission, was aware that the money in his IOTA account was "primarily for the . . . re-development of the Palm House Hotel."   Evans SEC Tr. at 37.   Nor does R. Matthews' SEC testimony change the fact that he was aware that moneys he moved from his IOTA account (regardless of whether someone directed him to do so) were used for purposes not related to the Palm House Hotel.   *See, e.g.*, Gov't Exh. Q (Evans' handwriting noting "RVM Home Taxes," RVM Mtg" among others on Quick Books printout regarding funds in his IOTA account for the

Palm House Hotel).   Finally, nothing Evans cites to in any way tends to exculpate him with respect to the charged bank fraud or his two other misrepresentations made to banks.

In fact, if Evans called R. Matthews, there is a good deal that the Government would be able to elicit during cross examination that would tend to further inculpate Evans.   For instance:

- When asked about Evans' letter to JPMC regarding funds Payne had purportedly transferred to him for the purchase of 115 Lower Church Hill Road, *see* Gov't Exh. T, R. Matthews specifically disclaimed knowing whether the contents of that letter were true.   *See* Matthews Vol. II SEC Tr. at 629.   This testimony suggests Matthews *did not* direct Evans to write this letter and that Evans was perhaps working on his own to perpetrate a bank fraud.

- When asked about the ultimate purchase of 115 Lower Church Hill Road, R. Matthews disavowed that the purchase was for his benefit. *See* Matthews Vol. II SEC Tr. at 647–48.   This is the same transaction for which Evans wrote a letter claiming to represent Laudano and stating that he had money in his IOTA account from Laudano for the purchase of 115 Lower Church Hill Road.   *See* Gov't Exh. I.   This testimony would also work against Evans' claim that he acted simply at the direction of R. Matthews and without the requisite knowledge.

In short, *Finkelstein* requires the defendant to show that the co-defendant's proposed testimony would be exculpatory.   *See Triumph.*, 260 F. Supp. 2d at 442 (denying severance motion under *Finkelstein*, in part, because "[defendant] has not made a sufficient showing that [co-defendant's testimony would be exculpatory").   Evans has pointed to nothing in R.

Matthews' SEC testimony to make such any such showing, let alone a showing that the purported testimony would be "substantially exculpatory." *Freedman*, 317 Fed. App'x at 25–26. To the contrary, any testimony provided by R. Matthews' would be rife with problems for Evans.

### 2. Evans Has Not Demonstrated that R. Matthews Would Waive his Fifth Amendment Privilege and Testify at a Severed Trial.

Even if R. Matthews' testimony was exculpatory, Evans has not demonstrated that R. Matthews would waive his Fifth Amendment privilege and testify at a subsequent trial of Evans. Evans has submitted no affidavit or even any statement from R. Matthews suggesting that he would testify at a severed trial but not at his own. Instead, Evans' claims that if R. Matthews is tried first, whatever the result, he will be compelled to testify at Evans' trial: if R. Matthews is acquitted – he will be protected from self-incrimination by the Double Jeopardy Clause; if he is convicted – then his Fifth Amendment rights would no longer matter. This argument is without merit.

As a preliminary matter, Evans has failed to show that R. Matthew will *not* testify during their joint trial, which would render severance on this question moot. "Self-serving, conclusory statements that exculpatory witnesses will not testify at a joint trial are not adequate to compel severance." *Triumph*, 260 F. Supp. 2d at 442 (quoting *United States v. Bari*, 750 F.2d 1169, 1177 (2d Cir. 1993). Aside from his simple say-so, Evans has offered nothing to suggest that R. Matthews will not, in fact, testify at his upcoming trial. *See United States v. Schlegel*, No 06-cr-0550 (JS), 2009 WL 3837305, at *2–3 (E.D.N.Y. Nov. 16 2009) (denying motion to sever under *Finkelstein* in part because the defendant "has not presented an affidavit [from the co-defendant] indicating that [the co-defendant] would be inclined to testify[,] and the Court has not found any

independent basis to support such a finding."); *cf. Finkelstein*, 526 F.2d at 523 (noting that defendant relied on an affidavit submitted by co-defendant which stated that "he would not testify at a joint trial but intended to testify on behalf of [the defendant] if [his] case was severed").   In other words, Evans has provided no assurance or argument that R. Matthews will not testify in his upcoming trial, subjecting him to examination by Evans' counsel and vitiating the need to sever on these grounds.   This alone is enough to conclude that this factor does not weigh in favor of severance.

Beyond that, Evans has not established that – assuming R. Matthews decided not to testify at their joint trial – he would be willing to waive his Fifth Amendment privilege and testify at a subsequent trial of Evans.   Evans' argument that if R. Matthews was tried first he would have to testify whatever the result, is flawed.   A conviction does not result in a waiver of a Fifth Amendment privilege *per se*, *see Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (holding that a defendant's Fifth Amendment privilege continues after he has been convicted), especially if that conviction is subject to appeal or collateral attack.   Similarly, an acquittal is no guarantee that R. Matthews would not take the Fifth Amendment as there may be additional uncharged misconduct to which he might be forced to admit on the stand.   Indeed, courts in this Circuit and this District have already addressed the very argument Evans advances here and found it wrong as a matter of law.   *See Triumph*, 260 F. Supp. 2d at 443 (noting the defendant's argument was based "on the unsupported assertion that [the co-defendant] would not have any Fifth Amendment concerns that would be implicated in a severed trial" and finding that even if the co-defendant testified at his own trial "he would still be able to invoke his Fifth Amendment privilege" if called to testify at the defendant's trial and that "[t]his would be particularly true if"

the defendant had a motion or appeal pending that could result in a new trial"); *Schlegel*, 2009 WL 3837305, at *2–3 ("[The defendant's] argument that [the co-defendant] will testify if she is tried first is speculative. This argument is premised on an unfounded claim that [the co-defendant] would no longer have any Fifth Amendment concerns if her trial proceeded first. Clearly, such an argument is incorrect.").

Evans' reliance on *United States v. Gilbert*, 504 F. Supp. 565 (S.D.N.Y. 1980) to advance his argument with respect to this factor is misplaced. First, the *Gilbert* court's finding with respect to *Finkelstein* was an alternative finding. *See* 504 F. Supp. at 571. The court's decision in *Gilbert* was actually driven by a concern about "prejudicial spillover" for the defendant who sought severance. *Id.* ("In my judgment, the risk of prejudicial spillover in respect of [the defendant,] charged in relatively few counts of a complex indictment, is unacceptable."); *see also United States v. Gilbert*, 668 F.2d 94, 96 (2d Cir. 1981) (noting that the district court in *Gilbert* granted severance to avoid prejudicing the moving defendant by the extensive evidence against his codefendant). That is not an issue here, and, in any event, Evans has not raised it. Second, the defendant seeking severance in *Gilbert* argued that he had joined the conspiracy late in the venture and was conceivably "an innocent dupe." The defendant seeking severance in *Gilbert* pointed to his co-defendant's potentially exculpatory SEC testimony that tended to corroborate that theory. This fact weighed on the court in *Gilbert* in making its alternative *Finkelstein* finding. *Gilbert*, 504 F. Supp. at 572 ("The exculpatory nature of [the co-defendant's] sought-after testimony, vis-a-vis, lies in [the co-defendant's] testimony before the SEC, quoted supra, that he really did not know [the defendant] at all, and had met him only twice."). Evans has not and cannot point to anything in the R. Matthews' SEC testimony as exculpatory as the SEC

testimony at issue in *Gilbert*.   To the contrary, and as established above, both R. Matthews' SEC testimony as well as Evans' SEC testimony make clear that Evans was intricately involved in the alleged misconduct charged in the Superseding Indictment and had not "lately come to the venture" as the defendant in *Gilbert*.   *See United States v. Bennet*, 485 F. Supp. 2d 508, 512 (S.D.N.Y. 2007) (distinguishing *Gilbert* in a case where a defendant seeking severance was "plainly neither 'lately come to the venture' nor an innocent dupe."); *see also Unied States v. Victor Teicher & Co., L.P.*, 726 F. Supp. 1424, 1439 (S.D.N.Y. 1989) (distinguishing *Gilbert* for similar reasons); *Triumph*, 260 F. Supp. 2d at 441 (similar).

In any event, the Second Circuit has (more recently) found that the mere fact that R. Matthews has refused to plead guilty here tends to suggest that if he decided not to testify at his own trial, he would be just as likely not to testify at a co-defendant's trial.   *See United States v. Wilson*, 11 F.3d 346, 354 (2d Cir. 1993) (affirming the district court where it found it as "unrealistic to think that [the defendant] would be any more willing to waive his privilege at a separate trial than at the joint trial"); *see also Finkelstein*, 526 F.2d at 524 (same).

In short, Evans has not demonstrated that R. Matthews would be any more likely to testify at a separate trial than their own joint trial.   This factor therefore does not weigh in favor of severance.

### 3. Any Exculpatory Evidence Evans seeks to Introduce through R. Matthews would be Cumulative.

The evidence Evans seeks to introduce through R. Matthews can be introduced through other sources.   The Government does not quibble with Evans' assertion that R. Matthews himself sometimes directed Evans to send money on his behalf.   And from there Evans is free to argue good faith.   However, the documents and SEC testimony establish that it was not only R.

Matthews, but others also who directed Evans to send money on R. Matthews' behalf. These other individuals could be called to testify to establish that he acted at R. Matthews' direction. *See Schlegel*, 2009 WL 3837305, at 2 (finding where other employees can provide similar information this factor weighs against severance).

Numerous people, aside from R. Matthews, directed Evans to transfer money out of his IOTA account. Indeed, in each of the citations to R. Matthews' SEC testimony that Evans provided to the Court, R. Matthews stated that it was either R. Matthews *or* Jade Yu who provided instruction to Evans. *See* Matthews Vol. I SEC Tr. at 132; Matthews Vol. II SEC Tr. at 565; *id.* at 706; *see also* Exhibit F (Yu instructing Evans to send a wire). Yu is not under indictment. And Yu, in her SEC testimony, speaks extensively about Evans' role and knowledge. *See generally* Gov't Exh. L. In fact, she will be a witness for the Government at trial, at which point Evans' attorneys will have the opportunity to cross examine her on this very subject. Beyond Yu, Evans himself testified that he received instructions from other individuals to send wires out of his IOTA account related to the Palm House Hotel. *See* Evans SEC Tr. at 58 (acknowledging he received direction from R. Matthews, Joe Walsh, Jade Yu, or Nick Laudano to send funds out of his IOTA account). Evans could call any of those other witnesses to testify on his behalf. In fact, like Yu, the Government anticipates calling Laudano to testify. So Evans' attorneys will have the opportunity to cross him as well. Any of these individuals could help provide admissible evidence related to Evans' state of mind.

Finally, Evans could testify on his own behalf and explain his own intent. And while that testimony might be attacked as self-serving, *see* Severance Mot. at 9, courts can still consider this fact in making a determination not to sever. *See, e.g.*, *Wilson*, 11 F.3d at 354

(finding co-defendant's testimony would be cumulative because the defendant "could have called any number of witnesses, *including himself*") (emphasis added); *Schlegel*, 2009 WL 3837305, at 2 ("Finally, the Court rejects [the defendant's] claim that he cannot provide testimony on his own behalf regarding certain aspects of the accounting fraud allegations[.] Clearly, [the defendant] can provide information regarding his alleged lack of involvement."). Indeed, Evans could blunt any attack on his statements as self-serving if corroborated with testimony from Walsh, Yu, Laudano, or any other individual with whom he interacted in connection with the IOTA transfers from his account.

This factor therefore also weighs against severance.

### 4. Judicial Economy Weighs in Favor of a Joint Trial.

As described above, there is a strong preference in the federal judicial system for joint trials of defendants properly joined. *See Zafiro*, 506 U.S. at 539; *Richardson*, 481 U.S. at 210. This is especially so in lengthy, complex trials. *See Schlegel*, 2009 WL 3837305 at *3 (citing *Richardson*, 481 U.S. at 210). At a separate trial, the Government would have to call the same witnesses to testify as to substantially similar, if not identical, subject matter. *Id.* Additionally, a number of EB-5 investors would have to travel from overseas to testify twice. *See Freedman*, 317 Fed. App'x at 25. This factor weighs strongly against severance.

### 5. R. Matthews' Anticipated Testimony Would Be Significantly Impeached if He Decided to Testify.

If R. Matthews' testified, he would be subject to damaging impeachment. Evans claims that R. Matthews had not made contradictory statements that would provide fodder for cross-examination and impeachment, Severance Mot. at 10, but that plainly is not the case.

Generally, courts find this factor weighs against severance where the defendant seeking

48

severance and his co-defendant are alleged to have jointly participated in the alleged conspiracies for which they are charged.   *See Schlegel*, 2009 WL 3837305, at *3 ("Finally, as to the fourth factor, the Court finds that there is a likelihood that Hatfield's testimony would be subject to impeachment given the fact that the Government seeks to prove that Hatfield and Brooks jointly participated in the alleged conspiracies for which they are charged.").   This is because the co-defendant who would provide the purportedly exculpatory evidence "has been the target of a Government investigation" which has yielded evidence that is "likely to provide fodder for cross-examination and questions regarding the [co-defendant's] credibility."   *United States v. Levy*, No. S5 11-cr-62 PAC, 2013 WL 787913, at *2 (S.D.N.Y. Mar. 4, 2013); *see also United States v. Ashley*, 905 F. Supp. 1146, 1166 (E.D.N.Y.1995).   That is the case here.

For instance, R. Matthews' SEC testimony regarding 115 Lower Church Hill Road is extraordinarily problematic.   In his testimony, he claimed that he had no relationship to NJL Development Group – the entity that purchased 115 Lower Church Hill Road.   *See* Matthews Vol. I SEC Tr. at 205.   He also claimed that the purchase was not for him, but instead an investment opportunity for Laudano.   *See* Matthews Vol. II SEC Tr. at 632.   In fact, the Government has a bevy of information that this was not true, including, *inter alia*:

- Email and other correspondence between R. Matthews and others that establish that Matthews organized the purchase of 115 Lower Church Hill Road.   *See generally* Matthews Vol. II SEC Tr. at 631–652 (Matthews testimony generally regarding 115 Lower Church Hill Road and documents with which he was confronted during his testimony).

- Testimony from witnesses that R. Matthews organized the purchase of 115 Lower

Church Hill Road.

- Testimony from witnesses that R. Matthews and his family continued to live in the residence even after Laudano and NJL Development Group, LLC purchased the property from the bank.

- Testimony from one witness in which R. Matthews admits he committed perjury during his SEC testimony while testifying about 115 Lower Church Hill Road.

The Government would explore all of these topics with R. Matthews, and more, to attack his credibility as a witness.

Beyond the purchase of 115 Lower Church Hill Road, R. Matthews would also be subject to cross examination on the misrepresentations made to EB-5 investors, including, as alleged in the indictment, his claim about well-known individuals serving on the Palm House and the role of his brother, G. Matthews, at the Palm House Hotel. In connection with these questions, the Government would confront R. Matthews' with documents and witness statements that demonstrate he made misrepresentations to the EB-5 investors in order to induce them to invest. He would also be asked about his understanding of why EB-5 investors were investing money and how his decision to divert millions of dollars of their money was consistent with the purposes of the EB-5 program.

In short, the Government has been investigating R. Matthews and Evans more than two years. During this time, it has collected a significant amount of evidence that could be used against R. Matthews if he decided to testify. In this context, it cannot credibly be claimed that R. Matthews' anticipated testimony would not be significantly impeached if he was called to

testify.[7]  *See Levy*, 2013 WL 787913, at *2.   This factor also weighs against severance.

For the foregoing reasons, Evans' motion to sever under *United States v. Finkelstein* should be denied.

### ii.  Evans' Sixth Amendment Rights Do Not Require Severance

Finally Evans claims that his trial should be severed because if the Government introduces R. Matthews' SEC testimony it will violate his Sixth Amendment confrontation rights, and specifically those established by *Bruton v. United States*, 391 U.S. 123 (1968) and *Crawford v. Washington*, 541 U.S. 36 (2004).   With the appropriate redactions and limiting instructions, however, the R. Matthews' SEC testimony can still be admitted against R. Matthews without running afoul of Evans' Confrontation Clause rights under either *Bruton* or *Crawford*.[8]

#### 1.  Redactions and an Appropriate Limiting Instruction will avoid any potential *Bruton* Problems.

It is well settled that a jury is presumed to follow a court's instructions, including the instruction that, in a joint trial, it consider a testifying witness's statements only as to certain defendants against whom they are admissible.   *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). A narrow exception to this general rule, however, applies where the "powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant,"

---

[7] Notably, Evans also seeks severance because the introduction of Matthews SEC testimony could be used at trial to establish the existence of the charged scheme to defraud as discussed below.   Severance Mot. at 15.   Implicit in this assertion is an admission that Matthews would be subject to a significant and damaging cross-examination based on his SEC testimony alone.

[8] To be clear, the Government has made no decision yet as to whether it will seek to admit R. Matthews' SEC testimony, either in part or in full, into evidence.

are admitted at a joint trial because they raise Confrontation Clause concerns. *Bruton v. United States*, 391 U.S. 123, 135 (1968). However, "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction . . . when the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence," *Richardson*, 481 U.S. at 211, or else where a defendant's "statement in which the names of codefendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise connected codefendants to the crimes." *United States v. Jass*, 569 F.3d 47, 56 (2d Cir. 2009). "[W]hat *Bruton* and its progeny demand is a redaction and substitution adequate to remove the 'overwhelming probability' that a jury will not follow a limiting instruction that precludes its consideration of a redacted confession against a defendant other than the declarant." *Id.* at 60.

The Second Circuit has explained that there is no requirement that "a confession be redacted so as to permit no incriminating inference against the non-declarant defendant." *Id.* at 61. The "critical inquiry," the Second Circuit continued,

> is . . . not whether a jury might infer from other facts (whether evidence admitted at trial or circumstances such as the number of defendants on trial) that a declarant's neutral allusion to a confederate might have referenced the defendant. It is whether the neutral allusion sufficiently conceals the fact of explicit identification to eliminate the overwhelming probability that a jury hearing the confession at a joint trial will not be able to follow an appropriate limiting instruction.

*Id.*

In this case, the Government will propose redacted versions of R. Matthews' SEC testimony in advance of trial that will remove any specific reference to Evans and will request a limiting instruction from the Court directing the jury only to consider admissions in the SEC testimony as to R. Matthews. The redactions will ensure that there is nothing in R. Matthews'

SEC testimony that could be construed as facially incriminating to Evans. Coupled with appropriate limiting instructions from the Court, there will be no potential for a *Bruton* violation.

### 2. Redactions and an Appropriate Limiting Instruction will avoid any potential *Crawford* Problems.

For his part, Evans apparently concedes that redactions suffice to remedy any potential *Bruton* problem. *See* Severance Mot. at 14 ("The government might be able to avoid the *Bruton* problem by redacting the testimony it introduces or by not introducing portions that identify Mr. Evans."). Evans, however, goes on to argue that "the government cannot avoid the *Crawford* problem by merely redacting what it seeks to introduce." *Id.* at 15. *Crawford*, however, does not preclude the introduction of R. Matthews' SEC testimony wholesale or else require severance.

In *Crawford*, the Supreme Court held that out-of-court testimonial statements by witnesses are barred under the Confrontation Clause, unless witnesses are unavailable and the defendants had the prior opportunity to cross-examine them, regardless of whether the court considers such statements to be reliable. *See* 541 U.S. at 68–69. As a result, the Government cannot (and will not) seek to introduce R. Matthews' SEC testimony in any way against Evans. For instance, the Government will not seek to use the testimony to establish the existence of a conspiracy or Evans' participation in the alleged conspiracy or scheme. This does not mean, however, that Evans' trial should be severed or that the Government should be precluded from introducing R. Matthews' SEC testimony as against R. Matthews alone.

It is well established in the Second Circuit that redactions and limiting instructions together suffice to overcome both *Bruton* and *Crawford* concerns. *See United States v. Lung Fong Chen*, 393 F.3d 139, 150 (2d Cir. 2004) ("[T]here is no separate *Crawford* problem, and

we see no indication that *Crawford* overrules *Richardson* or expands the holding of *Bruton*.").

Indeed, "even where multiple defendants are charged with the same crimes, the use of an out-of-court admission does not violate the Confrontation Clause when accompanied by an instruction limiting its admissibility as against the declarant defendant." *United States v. Defreitas*, 701 F. Supp. 2d 309, 315 (E.D.N.Y. 2010) (citing, *inter alia*, *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 135–37 (2d Cir. 2008) and *United States v. Harris*, 167 Fed. App'x 856, 859 (2d Cir. 2006)).

Here, if the Government seeks to use the R. Matthews' SEC testimony at trial, in addition to redactions, the Government will ask the Court to instruct the jury contemporaneous with its introduction that: (1) each statement may only be considered as against the declarant and (2) to provide the jury a list of uses for which the statements may not be considered, *e.g.*, to prove a non-declarant's membership in any of the conspiracies, or to prove a non-declarant's intent to achieve any of the conspiracies' objectives. Additionally, the government will ask the Court to reiterate these instructions in its final jury charge.[9] These steps should more than suffice to address any *Crawford* problems short of severance.[10] *See Defreitas*, 701 F. Supp. 2d at 315.

Accordingly, the Government respectfully requests that the Court deny the Severance

---

[9] Although this issue was not raised by R. Matthews, the Government will likewise redact Evans' SEC testimony and seek a limiting instruction with respect to Evans' SEC testimony, if the Government seeks to introduce any portion of Evans' SEC testimony.

[10] Notably, *Crawford* only applies to testimonial statements being offered for the truth of the matter asserted. *See Tennessee v. Street*, 471 U.S. 409, 414 (1985). To the extent that there is some other reason that R. Matthews' SEC testimony could be introduced, the Government is not here waiving its right to introduce an un-redacted portion of his transcript as needed. Additionally, if R. Matthews decides to testify at trial, the Government would be within its rights to introduce unredacted portions of the testimony as there would no longer be a Confrontation Clause issue.

Motion in full.

## V.   Conclusion

For the reasons stated above, the Government respectfully requests that the Court deny

the defendants' motions in full.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

_____/s/_____
JOHN T. PIERPONT, JR.
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv07973
157 Church Street, 25th Floor
New Haven, CT 06510
Tel.: (203) 821-3700


_____/s/_____
SUSAN L. WINES
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv02379
157 Church Street, 25th Floor
New Haven, CT 06510
Tel.: (203) 821-3700

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2018, a copy of the foregoing was filed electronically with the court and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

_____/s/_____
JOHN T. PIERPONT, JR.
ASSISTANT UNITED STATES ATTORNEY